201 P.3d 657

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Antonio Vasquez ROLON, Defendant–Appellant.**

No. 32989.

Court of Appeals of Idaho.

Oct. 23, 2008.

Rehearing Denied Dec. 2, 2008.

Review Denied Feb. 19, 2009.

Nevin, Benjamin, McKay & Bartlett, LLP, Boise, for appellant. Robyn A. Fyffe argued.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

GUTIERREZ, Chief Judge.

Antonio Vasquez Rolon appeals from his judgment of conviction for conspiracy to traffic in more than 28 grams of heroin and for conspiracy to traffic in more than 28 grams of cocaine. For the reasons set forth below, we affirm.

## I.

### FACTS AND PROCEDURE

The state established the following facts at trial. Boise police, using a confidential informant between October 2004 and January 2005, conducted twelve controlled buys of heroin and cocaine from a drug ring operating in the area. To initiate the buys, the informant or an officer would call one of two participants, nicknamed "Cumbia" and "Buda," who would instruct the caller where

to go and what type of vehicle to look for in which to complete the transaction. By tracking the vehicles used by the sellers during the controlled buys, acquiring information about the phone numbers used by the police to contact the sellers, and eventually stopping a car after it left the scene of a controlled buy, officers were able to identify one of the sellers as Carlos Ortiz. Following his arrest on December 8, when several balloons of both heroin and cocaine were found in his car, Ortiz agreed to provide information to authorities, including the names, phone numbers, and addresses of individuals involved in the distribution operation. Based on this information and further investigation, officers obtained several search and arrest warrants and eventually identified several other participants in the enterprise, including Rolon.

On January 18, 2005, Cumbia was arrested following a traffic stop, and after he placed a call to Buda where he requested that Buda get the "tools" which were in the steering column of his impounded vehicle, police discovered several grams of heroin and cocaine hidden in the column. The next day, police simultaneously executed warrants for the search of local residences they believed were utilized by the drug ring and for the arrest of conspiracy members. A small amount of cocaine and approximately $3,300 in cash were seized from the apartment shared by Buda and another participant, "Chaleco," and several grams of heroin and cocaine were found in a residence frequented by Cumbia. In addition, approximately 50 grams of heroin and cocaine, $15,680 in cash, and drug ledgers were discovered in a residence in Nampa. Drug ledgers were also found in a Boise residence. The same day, Rolon was arrested in Utah, where he resided. In a search of his vehicle, officers found the titles to three vehicles involved in the drug distribution in Idaho.

Rolon, Cumbia, Buda, Chaleco, Ortiz, and others were charged with conspiring to traffic in more than 28 grams of heroin, Idaho Code §§ 37–2732B(a)(6)(C), 18–1701, and conspiring to traffic in more than 28 grams of cocaine, I.C. §§ 37–2732B(a)(2)(A), 18–1701. Specifically in regard to Rolon, the state alleged that he directed the conspiracy members in the selling and delivery of the drugs between September 2004 and January 2005 and that he had delivered or arranged for the delivery of the drugs to the conspiracy members from Utah.

At trial, in addition to the evidence gathered from the controlled buys, the arrests of several of the conspiracy members, the subsequent searches of their vehicles, and the searches of the residences utilized by the group, the state also presented phone records showing an unusually high level of phone calls from Rolon to Chaleco, Buda, Cumbia, and another participant named "Chalo" during October, November, and January, and that Rolon had called Ortiz eleven times in a three-day span in early December. Additionally, officers testified that in late December, they had observed Rolon enter Chaleco's and Buda's apartment, watched as he and Chaleco left the residence and spoke briefly inside Chaleco's vehicle, and then followed Rolon to a bank where he had deposited $1,000 in an account. Police also observed Rolon return to the apartment for about thirty minutes. He then drove to a residence in Nampa that was utilized by the drug ring and remained there approximately thirty minutes. Later that day, Rolon returned to Utah.

The state also presented the testimony of Buda's wife, Mariya, and the testimony of Ortiz who explained his involvement in the conspiracy and his interactions with Rolon, who was considered the group's "boss."

The jury found Rolon guilty of both conspiracy charges. Following the district court's partial grant of a motion to reduce his sentences, Rolon was sentenced to a unified term of twenty-five years with fifteen years determinate for conspiracy to traffic in heroin and a consecutive unified term of ten years with three years determinate for conspiracy to traffic in cocaine. Rolon now appeals.

## II.

## ANALYSIS

### A. Jury Instructions

For the first time on appeal, Rolon argues the district court erred because the

instructions given the jury permitted them to find him guilty of conspiracy based on a general, rather than specific, intent standard and allowed the jury to find him guilty of conspiring to traffic in more than 28 grams of cocaine and heroin by relying on the amounts actually delivered by the local distribution ring, regardless of whether the state proved that he actually agreed to traffic in those quantities. In other words, he alleges that the instructions erroneously required the jury to find him guilty of trafficking in more than 28 grams if it found that he had merely agreed to manufacture, deliver, bring into the state, or possess *any* quantity of heroin or cocaine. He contends the error is reversible because the evidence connecting him to the conspiracy was "tenuous," and the jury could have found that while he intentionally furthered the conspiracy in trafficking in cocaine and heroin, he did not have knowledge of, and thus no specific intent to agree to traffic in more than 28 grams of heroin and cocaine. Similarly, he posits the evidence shows only that he knew of the conspiracy, but that he did "not have the specific intent to participate or affirmatively further its purposes."

The question whether the jury has been properly instructed is a question of law over which we exercise free review. *State v. Gleason*, 123 Idaho 62, 65, 844 P.2d 691, 694 (1992). When reviewing jury instructions, we ask whether the instructions as a whole, and not individually, fairly and accurately reflect applicable law. *State v. Bowman*, 124 Idaho 936, 942, 866 P.2d 193, 199 (Ct.App. 1993).

Ordinarily, a party may not claim that a jury instruction was erroneous unless the party objected to the instruction prior to the jury's beginning to deliberate. Idaho Criminal Rule 30(b). However, even absent a timely objection to the trial court, claims of instructional error are reviewable for the first time on appeal under the fundamental error doctrine. *State v. Anderson*, 144 Idaho 743, 748, 170 P.3d 886, 891 (2007). Fundamental error has been defined as error which goes to the foundation or basis of a defendant's rights, goes to the foundation of the case, or takes from the defendant a right

which was essential to his or her defense and which no court could or ought to permit to be waived. *State v. Babb*, 125 Idaho 934, 940, 877 P.2d 905, 911 (1994). In other words, an error is fundamental when it "so profoundly distorts the trial that it produces manifest injustice and deprives the accused of his fundamental right to due process." *Anderson*, 144 Idaho at 748, 170 P.3d at 891; *State v. Lavy*, 121 Idaho 842, 844, 828 P.2d 871, 873 (1992). Jury instructions that fail to require the state to prove every element of the offense violate due process and, thus, rise to the level of fundamental error. *Middleton v. McNeil*, 541 U.S. 433, 437, 124 S.Ct. 1830, 1832, 158 L.Ed.2d 701, 707 (2004); *Anderson*, 144 Idaho at 749, 170 P.3d at 892.

However, even when a fundamental error has occurred, this Court will not reverse a conviction if the error was harmless. *Anderson*, 144 Idaho at 749, 170 P.3d at 892; *State v. Field*, 144 Idaho 559, 165 P.3d 273 (2007). A harmless error analysis may be applied in cases involving improper instructions on a single element of the offense or even when a court omits an essential element from the instructions to the jury. *Neder v. United States*, 527 U.S. 1, 9–15, 119 S.Ct. 1827, 1833–1837, 144 L.Ed.2d 35, 46–51 (1999); *State v. Lovelace*, 140 Idaho 73, 79, 90 P.3d 298, 304 (2004); *State v. Lilly*, 142 Idaho 70, 72, 122 P.3d 1170, 1172 (Ct.App. 2005). But, before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710 (1967). If, after examining the record, the reviewing court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error, it should not find the error harmless. *Neder*, 527 U.S. at 19, 119 S.Ct. at 1838, 144 L.Ed.2d at 53; *Lilly*, 142 Idaho at 72, 122 P.3d at 1172. The test is whether the "record contains evidence that could rationally lead to a finding for the defendant with respect to the omitted element." *Neder*, 527 U.S. at 19, 119 S.Ct. at 1838, 144 L.Ed.2d at 53. Relevant considerations include whether the element was contested at trial and whether the evidence on

the element was overwhelming. *Neder*, 527 U.S. at 16–19, 119 S.Ct. at 1837–1838, 144 L.Ed.2d at 51–53; *Lilly*, 142 Idaho at 72, 122 P.3d at 1172. The government bears the burden of showing that the error had no effect on a defendant's substantial rights. *Lovelace*, 140 Idaho at 79, 90 P.3d at 304.

The conspiracy statute under which Rolon was charged, I.C. § 18–1701, defines a criminal conspiracy as follows:

> If two (2) or more persons combine or conspire to commit any crime or offense prescribed by the laws of the state of Idaho, and one (1) or more of such persons does any act to effect the object of the combination or conspiracy, each shall be publishable upon conviction in the same manner and to the same extent as is provided under the laws of the state of Idaho for the punishment of the crime or offenses that each combined to commit.

The offenses that Rolon was charged with conspiring to commit are defined in I.C. § 37–2732B(a)(2)(A) and I.C. § 37–2732B(a)(6)(C), respectively:

> . . . .
>
> (2) Any person who knowingly manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of twenty-eight (28) grams or more of cocaine or of any mixture or substance containing a detectable amount of cocaine is guilty of a felony, which felony shall be known as "trafficking in cocaine." If the quantity involved:
>
> (A) Is twenty-eight (28) grams or more, but less than two hundred (200) grams, such person shall be sentenced to a mandatory minimum fixed term of imprisonment of three (3) years and fined not less than ten thousand dollars ($10,000).
>
> . . . .
>
> (6) Any person who knowingly manufactures, delivers, or brings into this state or who is knowingly in actual or constructive possession of, two (2) grams or more of heroin or any salt, isomer, or salt of an isomer thereof, or two (2) grams or more of any mixture of substance containing a detectable amount of any such substance is guilty of a felony, which felony shall be

> known as "trafficking in heroin." If the quantity involved:
>
> . . . .
>
> (C) Is twenty-eight (28) grams or more, such person shall be sentenced to a mandatory minimum fixed term of imprisonment of fifteen (15) years and fined not less than twenty-five thousand dollars ($25,000).

■ Idaho appellate courts have stated that a conspiracy consists of an agreement between two or more persons to accomplish an illegal objective, coupled with one or more overt acts in furtherance of that objective, as well as the intent necessary to commit the underlying substantive crime. *State v. Lopez*, 140 Idaho 197, 199, 90 P.3d 1279, 1281 (Ct.App.2004); *State v. Munhall*, 118 Idaho 602, 606, 798 P.2d 61, 65 (Ct.App.1990). Thus, the conspiracy offense as charged against Rolon required the state to prove that: (1) Rolon and at least one other person agreed to traffic in 28 grams or more each of heroin and cocaine, (2) at least one of the conspirators performed some act in furtherance of the agreement, and (3) Rolon had the requisite intent to traffic in heroin and cocaine. *See Lopez*, 140 Idaho at 199, 90 P.3d at 1281.

The jury was given Instructions 16 and 17 which instructed them to find Rolon guilty of conspiracy to traffic in heroin and cocaine if the state proved that, between September 2004 and January 2005, Rolon and others "did willfully and knowingly combine, conspire, confederate, and agree to bring into the State of Idaho, deliver and/or possess 28 grams or more of a controlled substance" (either heroin or cocaine) and "did commit one or more of the ... overt acts alleged in the Indictment[s] for Count I [and Count II]." Additionally, Instruction 61 informed the jury that "intent under Idaho law is not an intent to commit a crime but is merely the intent to knowingly perform the act committed." Instruction 63 stated that when applied to the intent with which an act is done or omitted, the term "willfully" implies simply a purpose or willingness to commit the act or make the omission referred to. The jury was further given Instruction 70, the verdict form, and instructed that if it found

Rolon guilty of conspiracy to traffic in heroin and conspiracy to traffic in cocaine, they must then determine "whether the state has proved beyond a reasonable doubt the weight of the [heroin or cocaine] in the conspiracy." The verdict forms for both counts provided:

**QUESTION NO. 1:** As to the offense of COUNT I: CONSPIRACY TO TRAFFIC IN [COCAINE OR HEROIN], we, the jury, find the defendant, ANTONIO RO-LON:

Not Guilty _____ Guilty _____

If you unanimously answered Question No. 1 "Guilty", then you should proceed to Question No. 1(a). If you unanimously answered Question No. 1 "**Not Guilty**", then you should proceed to Question No. 2.

**QUESTION NO. 1(a):** We, the jury, find beyond a reasonable doubt that the amount of [heroin or cocaine] involved in the conspiracy offense was 28 grams or more.

Yes _____ No _____

We conclude that the jury instructions read as a whole were erroneous. By giving Instructions 61 and 63 which purported to explain the concepts of "intent" and "willfully" as they related to the general conspiracy instructions, the court erred in creating the impression that only a general intent was required to find Rolon guilty of conspiracy to traffic in controlled substances.

■ Negating the specific intent element amounts to fundamental error. A general criminal intent requirement is satisfied if it is shown that the defendant knowingly performed the proscribed acts, but a specific intent requirement refers to the state of mind which in part defines the crime and is an element thereof. *State v. Fox*, 124 Idaho 924, 926, 866 P.2d 181, 183 (1993). In other words, specific intent requires not only the doing of an act, but the performance of that act with the intent to cause the proscribed result. While an Idaho court has not explicitly held as much, it is generally accepted that conspiracy is a specific intent crime that requires the intent to agree or conspire *and* the intent to commit the offense which is the object of the conspiracy. *See* 15A C.J.S. Conspiracy § 112 (June 2008). In contrast, instructions given by the court in this case—defining both "intent" and "willfully"—described general intent (the intent to commit an act, not the intent to commit a crime) which, read in concert with the instructions setting out the elements of conspiracy, implied that Rolon needed only to have general, rather than specific intent (a higher standard) to be found guilty.[1]

The error in giving those instructions was only compounded by the special verdict form which asked the jury to determine, if it found that Rolon was guilty of conspiracy, whether the amount of drugs involved was 28 grams or more. Such an inquiry was mere surplusage, because if the jury found Rolon guilty of conspiracy to traffic in heroin and cocaine as defined by the elements instructions, it necessarily had found that he conspired to traffic in at least 28 grams of heroin and cocaine because that is what the elements instructions stated.

■ Rolon argues the error was not harmless, asserting that there was not sufficient evidence that he "knew of the conspiracy's objectives to distribute heroin and cocaine and that he participated or affirma-

---

1. We note that this issue would not have arisen had the model jury instruction for conspiracy been utilized without the additional instructions defining "intent" and "willfully." That instruction states that:

In order for the defendant to be guilty of Conspiracy, the state must prove each of the following:

1. On or about [date]
2. in the state of Idaho
3. the defendant [name] and [name(s)] [and] [another unknown person] [other unknown persons] agreed
4. to commit the crime[s] of [name(s) of crime(s)];

5. the defendant intended that [at least one of] the crime[s] would be committed;
6. one of the parties to the agreement performed [at least one of] the following act[s]: [list act(s) alleged in the charging document]
7. and such act was done for the purpose of carrying out the agreement.

If any of the above has not been proven beyond a reasonable doubt, then you must find the defendant not guilty. If each of the above has been proven beyond a reasonable doubt, you must find the defendant guilty.

Idaho Criminal Jury Instructions 1101 Conspiracy.

tively attempted to further its purpose" or that rationally could have led a jury to conclude that he specifically agreed to traffic in more than 28 grams of heroin and cocaine. We disagree. It is important to note that an agreement that is the foundation of a conspiracy charge need not be formal or express, and the evidence of the agreement need not be direct. *Lopez*, 140 Idaho at 199, 90 P.3d at 1281. Rather, the agreement may be inferred from the circumstances and proven by circumstantial evidence. *Id.; State v. Martin*, 113 Idaho 461, 466, 745 P.2d 1082, 1087 (Ct.App.1987).

Rolon argues that his contacts with the scheme were minimal and consistent only with his having provided the group with vehicles but not playing the active role advanced by the state. A review of the record convinces us, however, that there is overwhelming evidence that he was an active participant in the group and had, at least implicitly, agreed to traffic at least 28 grams of heroin and cocaine.

Most obvious in this regard, was Ortiz's testimony that Rolon was intricately involved in the operation, in fact, that he was the group's "boss."[2] Ortiz specifically testified that after being invited by Chaleco to join him in dealing drugs, Chaleco took him to a restaurant and explained that he was going to meet Chaleco's "boss." Once at the restaurant, the two men met Rolon, who welcomed Ortiz to the job. Rolon requested that Ortiz obtain false identification. Ortiz complied by having a photograph taken of himself which he turned over to Rolon. Later, Cumbia delivered the false identification (a Mexican driver's license) which bore the photograph that Ortiz had provided Rolon.

Soon thereafter, Ortiz was provided with cell phones and vehicles and was trained by Chaleco how to sell heroin and cocaine. Every morning he would come to a residence at 8:30, where he would turn over his earnings from the previous day and receive his supply of drug-filled balloons for the day. He would then leave and wait for phone calls from Buda or Cumbia instructing him where to meet customers. If he ran out of drugs during the day, he would call Cumbia to be re-supplied. In the four months between meeting Rolon and Ortiz's arrest, during which he sold hundreds of balloons filled with heroin and cocaine, Ortiz received numerous calls from Rolon, who knew the numbers of the phones despite Ortiz's never having told him. Ortiz testified that Rolon called to ensure that things were running smoothly in the drug operation and, at times, to ask why Ortiz had not been answering calls from his superiors or to mediate disputes.

Ortiz testified that he met Rolon in person to request a day off, and Rolon told him that he could have only one Sunday off. The day after Ortiz took his day off, a member of the group overdosed at the house where Ortiz normally picked up drugs on a daily basis, and it was Rolon who called Ortiz early that morning, warning him to stay away from the house. Ortiz last saw Rolon in person, prior to his arrest, at a meeting at the apartment of two of the co-conspirators that was attended by others involved in the conspiracy. In Rolon's presence, the group then went through the normal turn-over of cash and distribution of drugs for sale that day.

Another witness, Buda's wife, Mariya, testified to Rolon's contact with the group and his actions toward them and specifically, that she had seen Rolon in Buda's and Chaleco's apartment on approximately three occasions. She also indicated that Rolon had taken the Jeep Cherokee vehicle—later used by Ortiz in his drug running tasks—and returned with it a few months later with its paint color having been changed from red to silver. Mariya also recounted that on one occasion she had observed $500 in Buda's wallet, but that after Rolon had left, the money was no longer there.

Other evidence amply implicated Rolon in the conspiracy, the most compelling being

---

2. On appeal Rolon contends that Ortiz's testimony should not have been considered because it was not corroborated. However, we reject that argument later in this opinion, and thus rely on his testimony as a factor in determining whether any error in instructing the jury was harmless.

He also contends that Chaleco's statements to Ortiz that Rolon was the "boss" are inadmissible hearsay and violate his right to confrontation. We also reject those arguments and thus also rely on this statement here.

the unusually high level of phone contact between Rolon's two phones and those of the conspiracy participants. According to the telephone records presented at trial, Rolon called either Buda or Cumbia an average of twenty-one times a day over a period of sixty-two days. Evidence also showed that Rolon contacted Chaleco an average of twice a day over a two-week span, Chalo an average of five times a day for two weeks and Ortiz an average of four times a day for the three days leading up to Ortiz's arrest. Further evidence of a connection between Rolon and the conspiracy was uncovered when Rolon was arrested in Utah and his vehicle searched, inside which officers found the titles (bearing fictitious names) of several of the vehicles used by the co-conspirators in Boise in the drug operation. In addition, officers watched in late December as Rolon visited several of the residences from which the conspirators were known to operate and in which drugs, cash and other paraphernalia were later found. Also found was a document linking the Boise operation to Utah, where Rolon resided and was eventually arrested, that provided a breakdown of the drugs transported from Utah to Idaho for distribution.

This evidence overwhelmingly implicated Rolon in the activities of the conspiracy, with its extensive network, numerous cars, residences, and persons involved, all pointing to an operation that is handling far more than small quantities of drugs. On this evidentiary record, no rational juror could have found for Rolon on the question of his intent to traffic in at least 28 grams of the controlled substances. Thus, we conclude the instructional errors were harmless and did not contribute to the verdict.

**B. Co–Conspirator's Statements**

Rolon also argues that his right to confrontation and the hearsay rule were violated when the district court admitted testimony under the hearsay rule exception for co-conspirator statements. He contends the statements were not made in furtherance of the conspiracy and there was not sufficient independent evidence connecting Rolon to the conspiracy in the first place.

The statements to which Rolon objected at trial as hearsay, and which are at issue now, are those made by Chaleco to Ortiz at the time Ortiz joined the conspiracy. Specifically, Ortiz testified that when he first joined the group, Chaleco took him to a restaurant, telling him that he was going to meet "the boss," who Ortiz later identified as Rolon. Also, Ortiz testified that Chaleco had told him that Cumbia traveled to Utah to obtain heroin and cocaine from Rolon and that during these trips, Rolon would follow Cumbia in a different vehicle to ensure that "everything was running alright." Following Rolon's objection at trial, the district court held that the statements, along with others at issue at the time, clearly fell within the hearsay rule exception for the statements of a co-conspirator since the state had presented sufficient evidence under the rule to show that Ortiz and Rolon were participants in the conspiracy.

**1. Hearsay Rule Exception**

Rolon first takes issue with the admission of Chaleco's statements under the hearsay rule exception. Under Idaho Rule of Evidence 801(d)(2)(E), statements offered against a party are not hearsay if they are made "by a co-conspirator of a party during the course and in furtherance of the conspiracy." Evidence of statements made by co-conspirators is admissible if there is some evidence of the conspiracy or promise of its production. *State v. Jones*, 125 Idaho 477, 485, 873 P.2d 122, 130 (1994); *State v. Hoffman*, 123 Idaho 638, 642, 851 P.2d 934, 938 (1993); *State v. Ingram*, 138 Idaho 768, 771, 69 P.3d 188, 191 (Ct.App.2003). The scope of the co-conspirator exception is narrow, and the requirement that the co-conspirator's statement be made during the course of and in furtherance of the conspiracy is a prerequisite to admissibility that scrupulously must be observed. *State v. Harris*, 141 Idaho 721, 725, 117 P.3d 135, 139 (Ct.App.2005). There must also be sufficient evidence from which a trial court may reasonably infer the existence of a conspiracy. *Jones,* 125 Idaho at 485, 873 P.2d at 130; *Hoffman,* 123 Idaho at 642, 851 P.2d at 938; *Ingram,* 138 Idaho at 771, 69 P.3d at 191.

Thus, for the statements to be admissible under I.R.E. 801(d)(2)(E), there must have been some evidence, ·or promise of its production, of a conspiracy involving Chaleco and Rolon and the statements must have been made in furtherance of the conspiracy. Initially, Rolon argues that there was insufficient independent proof of Rolon's connection to the conspiracy admitted at trial to form the basis of the statements' admission under the hearsay exception. In making the preliminary determination of the existence of a conspiracy for purposes of the application of the rule, a trial court may consider evidence that is inadmissible under the rules or has not yet been demonstrated to be admissible. Rule 104(a); *Ingram*, 138 Idaho at 771, 69 P.3d at 191. For example, in *Ingram*, 138 Idaho at 771–72, 69 P.3d at 191–92, this Court cited several cases where courts had held that the hearsay statement itself may be considered in establishing the existence of a conspiracy. *See Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144, 156 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir.1999).

Rolon argues that we should adopt a rule that out-of-court statements alone cannot establish the existence of the conspiracy and the participation therein of the declarant and defendant for the purposes of Rule 801(d)(2)(E).[3] Rolon further argues that the uncorroborated trial testimony of a single co-conspirator cannot provide the independent foundation necessary for admission of a third co-conspirator's statements, as testified to by the in-court co-conspirator. However, we need not reach these arguments because a review of the record convinces us that we must rely on neither of these statements individually to conclude that the state presented sufficient evidence that Rolon was involved in a conspiracy that included Chaleco. Independent of Ortiz's testimony, the state introduced evidence of Rolon's visits to several residences in the Treasure Valley associated with the conspiracy and particularly of one occasion wherein Rolon was observed leaving one of the residences and going directly to the bank to deposit $1,000. Other corroborating evidence disclosed that his name was found on documents in the Nampa residence; that titles to three vehicles connected to the conspiracy were found in his vehicle; that there was an inordinately high level of phone contact between Rolon and the other members of the conspiracy; and that documents found catalogued the drugs being transported from Utah to Idaho. Considered in light of Ortiz's testimony, we find this evidence sufficient to establish the requisite connection between Rolon and the conspiracy members for the purpose of Rule 801(d)(2)(E).

■■■ Rolon also contends that Chaleco's statements were not properly admitted pursuant to Rule 801(d)(2)(E) because his statements regarding Rolon's role in the conspiracy were not "in furtherance" of the conspiracy. Specifically, he contends they were equivalent to "idle conversation" as opposed to statements intended to further the common objectives of the conspiracy.

Idaho courts have yet to deal with this particular nuance in regard to the co-conspirator hearsay rule exception, and the parties point us to several federal appellate cases which they each argue support their contention. The state partly relies on law emanating largely from the Sixth and Eighth Circuit courts which have routinely held that statements of a co-conspirator that merely "identify participants and their roles in the conspiracy" qualify as statements made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 393 (6th Cir.1997); *United States v. Clark*, 18 F.3d 1337 (6th Cir.1994).

For example, in *United States v. Davis*, 457 F.3d 817 (8th Cir.2006), the Court addressed the issue in the context of a drug conspiracy. There, a co-conspirator testified that he had twice purchased cocaine from a

---

**3.** The United States Supreme Court never determined whether a hearsay statement on its own and without other independent evidence is enough to establish the existence of a conspiracy such that the statement may properly be admitted under Rule 801(d)(2)(E). However, in *Bour-* *jaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the Court held that "a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." *Id.* at 181, 107 S.Ct. at 2781, 97 L.Ed.2d at 156.

source through an intermediary. Both times he had waited in the car while the intermediary entered a store, returned with the drugs, and informed him that he had purchased them from Davis. Over Davis's objection, the statement was admitted and the appellate court affirmed the admission because it had identified Davis as the source of the cocaine, noting that "[c]oconspirators' statements that discuss the supply source for the illegal drugs or identify a coconspirator's role in the conspiracy are considered statements made 'in furtherance' of the conspiracy." *Id.* at 825 (citations omitted).

Similarly, in *United States v. Arias,* 252 F.3d 973 (8th Cir.2001), the defendant objected when the government offered the testimony of a co-conspirator, who testified that another co-conspirator had told him that Arias was the source of the methamphetamine for the distribution scheme. Citing Eighth Circuit cases that statements made "in furtherance" of a conspiracy include those that identify the co-conspirators or the co-conspirators' supply source for illegal drugs, *see United States v. Meeks,* 857 F.2d 1201, 1203 (8th Cir.1988), and those statements that discuss a co-conspirator's role in the conspiracy, *see United States v. Johnson,* 925 F.2d 1115, 1117 (8th Cir.1991), the Court held the statements were admissible under the hearsay rule exception as being "in furtherance" of the conspiracy to distribute methamphetamine. *Arias,* 252 F.3d at 977.

▮ We, however, consider the above applications of the rule to be too broad. The plain language of the rule requires not only that the statement be made during and about the conspiracy, but adds the conjunctive and in furtherance of the conspiracy. *See Monroe v. Commonwealth,* 244 S.W.3d 69, 77 (Ky.2008) (rejecting the Sixth Circuit's interpretation of the rule as being too broad and failing to take into account that the rule plainly requires a statement be "in furtherance" of a conspiracy). Thus, a determining factor is whether a statement in any way assists or advances the objectives of a conspiracy—otherwise such a statement is not "in furtherance" as prescribed by the rule. We also note that this Court emphasized in *Harris,* 141 Idaho at 725, 117 P.3d at 139,

that the scope of the co-conspirator exception is narrow, and the requirement that the conspirator's statement be made both during the course of and in furtherance of the conspiracy is a prerequisite to admissibility that scrupulously must be observed. (citing *Krulewitch v. United States,* 336 U.S. 440, 443–44, 69 S.Ct. 716, 718–19, 93 L.Ed. 790, 794–95 (1949)).

With these considerations in mind, we find the approach of the Ninth Circuit, which has taken a narrower view of the issue, to be more appropriate. In short, the Court has allowed the admittance of testimony defining co-conspirators' roles as being in furtherance of a conspiracy, but, unlike the Sixth and Eighth Circuit cases discussed above, has not allowed their admission in all circumstances. Rather, the Court has distinguished between those that are a product of "idle conversation" and those made with the intent to further the conspiracy. In *United States v. Bibbero,* 749 F.2d 581 (9th Cir. 1984), the defendant became involved in a large-scale drug smuggling operation with several men known as Coronado Company. Initially, he financed the import of seven tons of marijuana from Thailand to the United States. When this deal was completed, Bibbero and the Coronado Company planned another smuggling operation, whereby six tons of marijuana was landed on the California coast, was unloaded and then transported to a house by an off-loading crew, where it was weighed and packaged. Bibbero stayed in a hotel during the operation, but he later arrived at the house and congratulated the crew members before departing. On direct examination, a government witness, Allen Logie, testified that he had participated in the second smuggling operation as the off-loading equipment manager and that when he arrived at the house where the marijuana was being weighed and packaged, he had seen Bibbero and an associate there. He then testified that another member of the conspiracy, Vaughan, had told him that the marijuana being loaded into a truck by Bibbero's associate "belonged to little Rick [Bibbero]." The trial court admitted the statement on the basis of the co-conspirator exception in Rule 801(d)(2)(E). Noting that mere conversation between conspirators is

not admissible under the rule, the Court relied on the fact that Logie virtually acknowledged that the statement was idle conversation and Logie's limited responsibilities as an equipment manager, such that the statement of ownership was immaterial to him, to conclude that the statement was not in furtherance of the conspiracy. *Bibbero,* 749 F.2d at 584. The Court also noted that Logie confirmed upon cross-examination that the information did not affect his conduct afterwards and despite the fact that he received the information while laboring on behalf of the conspiracy, the evidence clearly indicated that the co-conspirator was merely informing Logie of the marijuana's ownership without any intent to further the conspiracy. *Id.*

Here, the state argues that *Bibbero* is distinguishable, citing *United States v. Moody,* 778 F.2d 1380 (9th Cir.1985), wherein the Ninth Circuit Court dealt with the same smuggling operation as in *Bibbero.* There, Moody and his co-defendant Hollenbeck agreed with the Coronado Company to procure approximately two tons of marijuana in Thailand and ship it to the United States. This was successfully completed, and at their trial, a co-conspirator with substantial responsibility in the Coronado Company testified that Lahodny, one of the main figures in the company, had told him that Moody and Hollenbeck would procure the marijuana in Thailand. Relying heavily on *Bibbero,* the appellants argued the district court erred in admitting the statement, but the *Moody* Court concluded that the present case was "sharply distinguishable." The Court pointed out that in *Bibbero,* it had emphasized that while the testifying co-conspirator had been the ship-to-shore off-loading equipment manager for one of the smuggling operations, he had a very limited role in subsequent aspects of the operation—thus making Vaughan's statement of ownership "immaterial" to him. The Court then distinguished Moody's and Hollenbeck's case, stating:

> By contrast, Lahodny's statement to Vaughan was made to one who possessed a substantial interest in the continuing operation of the conspiracy and who participated in the planning stages of its marijuana smuggling. While Logie was paid a flat

rate for his limited services, Vaughan possessed an 11% interest in the net profits of Coronado Company smuggling operations. According to uncontradicted testimony, Vaughan helped to determine questions as important as where the marijuana would be shipped. We cannot accept the contention that Lahodny engaged in idle conversation when he told Vaughan that Moody and Hollenbeck were the parties who, according to plan, would travel to Thailand to procure the marijuana for the Company to smuggle.

*Moody,* 778 F.2d at 1383.

*United States v. Martinez–Gonzalez,* 60 Fed.Appx. 42 (9th Cir.2003), applies the principle articulated in *Moody.* There, Ruiz was charged with various crimes relating to a heroin and methamphetamine distribution operation, including conspiracy to distribute heroin. At trial, Ruiz objected to the introduction of testimony from Nava, a member of the conspiracy who made his living selling drugs and who said that Tomate, another co-conspirator who also sold drugs, had told him that Ruiz supplied him heroin. Specifically, Nava testified that he and Tomate would supply heroin to each other on occasion. He described an incident where Tomate had asked to borrow some heroin, Nava had agreed, and Tomate responded that he would pay Nava back when "Mr. Miguel [Ruiz] exchanged the ones he had brought to him," because "the ones he brought were no good." The district court concluded the statements were admissible because they had helped to induce the transaction by explaining the reason why Tomate needed a loan of heroin and explaining how he intended to repay that loan. The Ninth Circuit affirmed the statement's admission, citing *Moody's* emphasis of the difference between statements made to someone with a "limited role" and "one who possessed a substantial interest in the continuing operation of the conspiracy" and noting that the statements had been made to Nava, a party who had "more than a minimal role in the conspiracy and who possessed a substantial interest in the conspiracy." *Id.* at 47 (citing *Moody,* 778 F.2d at 1382–83).

Here, Rolon objects to two different statements made by Chaleco to Ortiz. We conclude that both statements were made "in furtherance" of the conspiracy. Specifically, both comments were made after Ortiz had agreed to join the drug ring and were part of his "orientation" as they explained the operations and roles of the conspiracy. Ortiz, while perhaps considered less invested in the drug ring, was nonetheless distributing drugs daily and collecting cash, all for remuneration. He received compensation of $2,000 per month, all expenses paid, some amounts of drugs for personal use, and use of cell phones and vehicles. It is natural and necessary that Chaleco would identify Rolon's role in the operation. Ortiz, who subsequently received frequent telephone calls from Rolon, was not so far removed from the details of the operation that Chaleco's identification of Rolon as the source of the drugs would be "idle conversation." Thus, we conclude the district court did not err in admitting the statements under the conspiracy hearsay exception.

### 2. Right to Confrontation

In addition, Rolon argues that his right to confrontation was violated by the district court's erroneous admission of Ortiz's testimony regarding Chaleco's statements. The Confrontation Clause of the Sixth Amendment guarantees criminal defendants the right to confront witnesses at trial. U.S. CONST. amend VI (providing in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him"). Traditionally, the admission of hearsay evidence against a criminal defendant implicates the Sixth Amendment because the defendant is not afforded the opportunity to confront the out-of-court declarant. *See Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 1373, 158 L.Ed.2d 177, 203 (2004). In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) the Supreme Court established a two-part test to determine the admissibility of hearsay testimony in light of Confrontation Clause concerns, stating that the admission of nontestimonial hearsay statements admitted as evidence against an accused in a criminal trial violate the right to

confrontation unless a witness is (1) unavailable and (2) the statements bear an "adequate indicia of reliability." *Id.* at 65–66, 100 S.Ct. at 2538–2539, 65 L.Ed.2d at 607–608. The Court further held that reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay rule exception, but in other cases, the evidence must be excluded unless there is a showing of particularized guarantees of trustworthiness. *Id.* at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608.

However, in *Crawford,* 541 U.S. at 68, 124 S.Ct. at 1375, 158 L.Ed.2d at 203, the Supreme Court modified this traditional principle by making a distinction between "testimonial" and "nontestimonial" evidence. The Court held that if a hearsay statement is "testimonial," admission of the statement violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Id.* However, if the hearsay statement is "nontestimonial," the *Crawford* rule does not apply. *Id.* The Court, however, was not clear as to whether the *Ohio v. Roberts* test still applied to such nontestimonial statements, but did intimate that it no longer may be pertinent, stating that, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that *exempted such statements from Confrontation Clause scrutiny altogether." Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203, (emphasis added).

Here, in response to the state's assertion that *Crawford* completely overruled *Roberts,* Rolon argues that *Crawford* only overruled *Roberts* in regard to testimonial statements and cites several cases from various jurisdictions holding as much. *See e.g., State v. Doe,* 140 Idaho 873, 103 P.3d 967 (Ct.App.2004) (assuming, since the Supreme Court had not explicitly overruled *Roberts,* that nontestimonial statements were still implicated by the Confrontation Clause and applying the *Roberts* test to statements that were clearly nontestimonial). However, the tide has turned as the Supreme Court has continued to eluci-

date what it had only intimated in *Crawford*—that the Confrontation Clause was not implicated by nontestimonial statements. *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), answered the question that *Crawford* left open—whether the Confrontation Clause still bars nontestimonial statements if they do not satisfy the "indicia of reliability" test of *Roberts*. The Court held that only testimonial hearsay is subject to the Confrontation Clause, stating, "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Washington*, 547 U.S. at 821, 126 S.Ct. at 2273, 165 L.Ed.2d at 237. The Court also stated, " 'The text of the Confrontation Clause reflects this focus [on testimonial hearsay].' ... A limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." *Id.* at 823–824, 126 S.Ct. at 2274, 165 L.Ed.2d at 238 (internal citations omitted). Consequently, after finding that the statement in *Davis* was nontestimonial, the Court did not go on to conduct a *Roberts* analysis.

Furthermore, as Rolon admits, in a more recent case, *Whorton v. Bockting*, 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007), the Court again referred to the fact that *Roberts* had been overruled in regard to nontestimonial statements. Rolon nevertheless urges us to consider this as mere dicta and conclude that Sixth Amendment Confrontation Clause principles remain applicable to nontestimonial hearsay statements. In *Whorton*, in the context of considering the retroactive applicability of *Crawford*, the Court stated:

> With respect to *testimonial* out-of-court statements, *Crawford* is more restrictive than was *Roberts*, and this may improve the accuracy of fact-finding in some criminal cases.... But whatever improvement in reliability *Crawford* produced in this respect must be considered together with *Crawford's elimination of Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements.* Under *Roberts*, an out-of-court nontestimonial statement not subject

to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability.

*Id.* at 419, 127 S.Ct. at 1183, 167 L.Ed.2d at 13 (emphasis added).

The Supreme Court has made it abundantly clear that the Confrontation Clause has no application to nontestimonial hearsay statements. And given that it is undisputed in this case that Chaleco's statements to Ortiz are nontestimonial in nature, we reject Rolon's assertion that his Confrontation Clause rights were violated by their admission.

### C. Corroboration

██ Rolon further contends the state presented insufficient evidence to corroborate Ortiz's testimony implicating Rolon in the conspiracy to traffic in cocaine and heroin. He relies on Idaho Code § 19–2117, which provides:

> A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof.

As this Court explained in *State v. Campbell*, 114 Idaho 367, 757 P.2d 230 (Ct.App. 1988), the corroboration requirement is designed to prevent a conviction that is based on false testimony actuated by an accomplice's self-interest:

> The purpose of the corroboration requirement is to offset the danger that an accomplice may wholly fabricate testimony inculpating an innocent person in order to win more lenient treatment for the alleged accomplice. The corroborating evidence offered "need only connect the defendant with the crime." The corroborating evidence must be independent of the accomplice's testimony, but it need not be sufficient in and of itself to con-

vict the defendant. The corroborating evidence may be slight, need only go to one material fact and may be entirely circumstantial.

*Id.* at 369, 757 P.2d at 232.

With these principles in mind, as we have described in detail in the sections above, there was a large and significant body of evidence—including the phone records, evidence collected from the controlled buys, search warrants, observations of Rolon's activities and search of his vehicle—that corroborate Ortiz's testimony and connect Rolon to active participation in the conspiracy. Accordingly, Rolon's claim that Ortiz's testimony was not properly corroborated is without merit.

### D. Cumulative Error

Finally, Rolon contends that the cumulation of irregularities at trial denied him the right to a fair trial. The cumulative error doctrine requires reversal of a conviction when there is an accumulation of irregularities, each of which by itself may be harmless, but when aggregated, show the absence of a fair trial in contravention of the defendant's constitutional right to due process. *Dunlap v. State,* 141 Idaho 50, 65–66, 106 P.3d 376, 391–92 (2004). In order to find cumulative error, this Court must conclude there is merit to more than one of the alleged errors and then conclude that these errors, when aggregated, denied the defendant a fair trial. *Id.* at 66, 106 P.3d at 392. Here, we only found one error, thus a cumulative error analysis is inappropriate.

## III.

## CONCLUSION

While the district court erred in instructing the jury in regard to the intent element of conspiracy, we conclude the error was harmless because no rational juror could have found for Rolon on the question of his intent to traffic in at least 28 grams each of cocaine and heroin. It was not erroneous, however, for the lower court to admit Chaleco's statements to Ortiz regarding Rolon's role in the conspiracy, as they were admissible under the co-conspirator's statements exception to the hearsay rule and did not violate Rolon's right to confrontation. Finally, we conclude that there was sufficient evidence that corroborated Ortiz's testimony implicating Rolon in the conspiracy, and given that we have only identified one error, there is no cumulative error requiring reversal of Rolon's conviction. Rolon's judgment of conviction for conspiracy to traffic in controlled substances, heroin and cocaine, is affirmed.

Judge LANSING and Judge PERRY concur.