**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 38813**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2013 Opinion No. 41** |
| Plaintiff-Respondent, | ) | |
| | ) | **Filed: July 11, 2013** |
| v. | ) | |
| | ) | **Stephen W. Kenyon, Clerk** |
| FRANK JAMES TANKOVICH, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. John P. Luster, District Judge.

Judgment of conviction for malicious harassment and conspiracy to commit malicious harassment, <u>affirmed</u>.

Stephen D. Thompson, Ketchum, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent. Jessica M. Lorello argued.

_____

LANSING, Judge

Frank James Tankovich appeals from his convictions for malicious harassment and conspiracy to commit malicious harassment. He asserts that the court erred by denying his motion to sever his trial from that of his co-defendant, that the court erred in admitting evidence, and that the evidence was insufficient to support the guilty verdict.

## I.

## BACKGROUND

On the afternoon of August 16, 2009, Frank Tankovich and his brothers, William and Ira Tankovich (hereinafter referred to as Tankovich, William, and Ira, respectively) drove past the home of Kenneth Requena, a man of Puerto Rican descent, and his wife, Kimberly Requena (hereinafter referred to as Kenneth and Kimberly, respectively). The Requenas were standing in their garage at the time. As the Tankoviches passed, the Requenas noticed a swastika drawn in

1

the dirt on the side of the Tankoviches' truck[1] and also noticed that the occupants of the truck were staring at them. The Requenas heard the tires of the truck skid or squeal to a stop and saw the truck reverse and stop in front of their driveway. Tankovich, who was the driver, yelled at Kenneth to come over to the truck, and Tankovich, William, and Ira all exited the truck and began to approach the Requenas. At Kenneth's request, Kimberly retrieved a gun from inside the Requenas' home, handed it to Kenneth, and called 911 while Kenneth cocked the gun and stood in the garage. The Tankoviches yelled at Kenneth, telling him he had "f--ked up," that they were going to "f--k [him] up," and that they would come back later. They then returned to the truck and drove away.

The police arrived shortly after the Tankoviches left, took statements from the Requenas, and departed. Approximately twenty to thirty minutes later, Tankovich and William returned to the Requenas' house on foot with William's pit bull, and Tankovich stated, "You f--ked with the wrong people. I am going to f--k you up." Kenneth again asked his wife to retrieve his gun and to call 911.[2] At about the same time, Ira approached on foot from another direction carrying a gun. The police, who had remained in the area following the previous incident, quickly arrived, at which point Ira threw the gun away and began to walk away but was stopped by the police and arrested. As Tankovich and William spoke with the police, they loudly and repeatedly referred to Kenneth as a "f--kin' beaner" and "f--kin' terrorist," and told the police that "they were going to take care of things themselves" and that they were "gonna get that f--kin' beaner" while looking or pointing at the Requenas. Tankovich and William initially refused to leave, apparently because they wanted the police to arrest Kenneth for his display of a firearm, but they eventually left and no additional arrests were made at that time.

Tankovich was subsequently charged with malicious harassment, Idaho Code § 18-7902, and conspiracy to commit malicious harassment, I.C. §§ 18-7902, 18-1701, and his case was joined for trial with the cases against William and Ira. At the initial trial, the district court declared a mistrial after inadmissible evidence was presented to the jury. At a second trial, Ira was convicted of conspiracy to disturb the peace, but the jury deadlocked on the charges against

---

[1]     Although not visible to the Requenas, the Requenas' neighbors testified that the words "Born 2 Kill" were written in the dirt on the other side of the truck.

[2]     Several 911 calls were apparently made, including one made by William shortly before William and Tankovich arrived at the Requenas' home.

Tankovich and William, and the court again declared a mistrial. The State brought Tankovich and William to trial a third time, and the jury found both guilty of malicious harassment and conspiracy to commit malicious harassment.

## II.

## ANALYSIS

### A.    Tattoo Evidence

Tankovich asserts that the court erred by admitting photographs of William's and Ira's tattoos and expert testimony explaining the common meanings of the symbols depicted in the tattoos. He argues that this evidence was irrelevant and unfairly prejudicial and that the expert testimony invaded the province of the jury.

The tattoos depicted in the photographs include a tattoo on Ira's calf or ankle of the words "Aryan Pride" over an inverted pentagram, a tattoo of an eagle on Ira's back, a tattoo of "SS" lightning bolts on William's arm, and a tattoo on William's chest of the words "Chris forever" with one or more three-leaf clovers embedded in the word "Chris." No evidence was presented to suggest that Tankovich has any tattoos. The State's expert testified that tattoos of "SS" lightning bolts are commonly associated with "Aryan neo-nazi belief systems or white supremacy belief systems," and that three-leaf clover tattoos are "common symbols worn by Aryan white supremacists."

After the photographs were admitted into evidence, but before they were published to the jury and before the State presented expert testimony on the common meaning of the tattoos, the court instructed the jury not to consider "the evidence that is about to be presented to you with respect to the tattoos" (necessarily including both the photographs and the expert testimony) in deciding the charge of malicious harassment against Tankovich. The court also gave the jury a written instruction stating, "There has been no evidence of any tattoos on the person of Frank Tankovich. You should not consider the evidence about the tattoos in deciding the charge of Malicious Harassment against Frank Tankovich." We presume that the jury followed the jury instructions given by the trial court in reaching its verdict. *State v. Pepcorn*, 152 Idaho 678, 690, 273 P.3d 1271, 1283 (2012); *State v. Thumm*, 153 Idaho 533, 544, 285 P.3d 348, 359 (Ct. App. 2012). Therefore, our inquiry is limited to deciding the admissibility of the tattoo evidence as it pertains to the conspiracy charge against Tankovich.

3

### 1. Relevance

Tankovich does not dispute that the tattoos were relevant to the motive or intent of the persons bearing them,[3] but argues that the evidence of his brothers' tattoos was not relevant against him. In the charge against Tankovich for conspiracy to commit malicious harassment, William and Ira were named as his co-conspirators. Thus, Tankovich is asserting that evidence of one co-conspirator's intent is not relevant to a charge of conspiracy against another co-conspirator.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." I.R.E. 403. Whether evidence is relevant under Rule 401 is an issue of law that we review de novo, while the decision to admit relevant evidence over a Rule 403 objection is reviewed for an abuse of discretion. *State v. Shutz*, 143 Idaho 200, 202, 141 P.3d 1069, 1071 (2006); *State v. Sanchez*, 147 Idaho 521, 525, 211 P.3d 130, 134 (Ct. App. 2009); *State v. Clark*, 115 Idaho 1056, 1059, 772 P.2d 263, 266 (Ct. App. 1989).

A conspiracy consists of an agreement between two or more persons to accomplish an illegal objective, coupled with one or more overt acts in furtherance of that objective, as well as

---

[3]    The relevance of tattoo evidence to a person's intent or motive has not been directly addressed in Idaho, but other jurisdictions have held that tattoos may be used to demonstrate motive or intent. *People v. Valdez*, 281 P.3d 924, 962 (Cal. 2012) (evidence of tattoos was relevant to show identity and motive); *People v. Skinner*, 53 P.3d 720, 723 (Colo. Ct. App. 2002) (evidence of tattoo was "logically relevant to the issue of intent because it made it more probable that defendant possessed the intent to commit the assault than without such evidence. Further, it was relevant to the issue of motive, providing an explanation for defendant's actions."); *People v. James*, 810 N.E.2d 96, 106 (Ill. App. Ct. 2004) (evidence of tattoo relevant to show motive); *State v. Novak*, 949 S.W.2d 168, 171-72 (Mo. Ct. App. 1997) (evidence of defendant's "white pride" tattoo admissible to show motive for murder); *People v. Wagner*, 811 N.Y.S.2d 125, 126 (N.Y. App. Div. 2006) ("white supremacist tattoos were relevant as to motive and intent to commit aggravated harassment"); *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (tattoos admissible to show defendant's racial animosity, demonstrating motive for murder). *But see People v. Mason*, 653 N.E.2d 1371, 1376 (Ill. App. Ct. 1995) (prosecutor could use tattoos to show gang membership, but it was improper to use tattoos to show defendant was proud of membership).

the intent necessary to commit the underlying substantive crime. I.C. § 18-1701;[4] *State v. Rolon*, 146 Idaho 684, 690, 201 P.3d 657, 663 (Ct. App. 2008); *State v. Lopez*, 140 Idaho 197, 199, 90 P.3d 1279, 1281 (Ct. App. 2004); *State v. Munhall*, 118 Idaho 602, 606, 798 P.2d 61, 65 (Ct. App. 1990); *State v. Martin*, 113 Idaho 461, 466, 745 P.2d 1082, 1087 (Ct. App. 1987). It is generally accepted that conspiracy is a specific intent crime that requires the intent to agree or conspire and the intent to commit the offense which is the object of the conspiracy. *Rolon*, 146 Idaho at 691, 201 P.3d at 664. An agreement that is the foundation of a conspiracy charge need not be formal or express, and the evidence of the agreement need not be direct. *Id.* at 692, 201 P.3d at 665; *Lopez*, 140 Idaho at 199, 90 P.3d at 1281. Rather, the agreement may be inferred from the circumstances and proven by circumstantial evidence. *Rolon*, 146 Idaho at 692, 201 P.3d at 665; *Lopez*, 140 Idaho at 199, 90 P.3d at 1281.

The crime of malicious harassment is defined by I.C. § 18-7902 as follows:

> It shall be unlawful for any person, maliciously and with the specific intent to intimidate or harass another person because of that person's race, color, religion, ancestry, or national origin, to:
> (a) Cause physical injury to another person; or
> (b) Damage, destroy, or deface any real or personal property of another person; or
> (c) Threaten, by word or act, to do the acts prohibited if there is reasonable cause to believe that any of the acts described in subsections (a) and (b) of this section will occur.

Thus, in order to prove the charge of conspiracy to commit malicious harassment against Tankovich, the State was required to prove, among other things, that Tankovich and at least one other person conspired or agreed to commit one of the acts proscribed by I.C. § 18-7902(a)-(c) "with the specific intent to intimidate or harass" Kenneth because of his "race, color, religion, ancestry or national origin."

In our view, evidence of William's and Ira's racially-based intent or motivation was relevant to whether Tankovich's own actions were similarly motivated. If William and Ira

---

[4] Idaho Code section 18-1701 provides:
> If two (2) or more persons combine or conspire to commit any crime or offense prescribed by the laws of the state of Idaho, and one (1) or more of such persons does any act to effect the object of the combination or conspiracy, each shall be punishable upon conviction in the same manner and to the same extent as is provided under the laws of the state of Idaho for the punishment of the crime or offenses that each combined to commit.

harbored an intent to harass Kenneth because of his race, color, ancestry, or national origin, it is more likely that Tankovich's participation in the alleged conspiracy was with that same criminal motive or purpose. That is, the motive of one co-conspirator is probative, though not necessarily conclusive, to prove the intent of another co-conspirator. Therefore, the tattoo evidence was relevant against Tankovich.

Tankovich also asserts that the tattoo evidence was unfairly prejudicial and confusing to the jury,[5] and therefore inadmissible under I.R.E. 403 because he did not have any similar tattoos. This argument is essentially an assertion that the evidence was unfairly prejudicial and confusing because it was not relevant to the charges against him. It is merely a reiteration of the argument, rejected above, that the evidence was not relevant. As Tankovich has not argued that the evidence had any other prejudicial effect, there is no merit in his contention that the evidence should have been excluded pursuant to I.R.E. 403.

### 2. I.R.E. 702

Having determined that evidence of his brothers' tattoos was relevant, we next address Tankovich's argument that the expert's testimony--explaining that some of the symbols displayed in the tattoos are commonly associated with white supremacist groups--was inadmissible because it "invaded the province of the jury."[6] A trial court has discretion in the admission or exclusion of expert testimony, and its decision will be reviewed for an abuse of discretion. *State v. Perry*, 139 Idaho 520, 521, 81 P.3d 1230, 1231 (2003); *State v. Critchfield*, 153 Idaho 680, 683, 290 P.3d 1272, 1275 (Ct. App. 2012). In determining whether the trial court abused its discretion, we inquire: (1) whether the trial court correctly perceived the issue as a discretionary one; (2) whether the trial court acted within the outer bounds of its discretion and consistently with the applicable legal standards; and (3) whether the trial court reached its

---

[5] Idaho Rule of Evidence 403 provides:
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[6] The State asserts that the issue was not preserved for appeal. During a pretrial hearing on the State's motion in limine, Tankovich joined arguments of his co-defendant that the proposed expert testimony would not be beneficial to the trier of fact. The issue was again discussed by the court and counsel immediately before the State presented the expert testimony at trial. Therefore, the issue was preserved.

decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989); *State v. Ortiz*, 148 Idaho 38, 41, 218 P.3d 17, 20 (Ct. App. 2009).

Idaho Rule of Evidence 702 provides that an expert witness may testify to an opinion "[i]f scientific, technical, or other specialized knowledge *will assist the trier of fact* to understand the evidence or to determine a fact in issue." (Emphasis added.) An expert's testimony is not inadmissible merely because it embraces an ultimate issue to be decided in the case, I.R.E. 704, but it must "assist the trier of fact to understand the evidence or to determine a fact that is in issue." *Chapman v. Chapman*, 147 Idaho 756, 760, 215 P.3d 476, 480 (2009). The function of the expert is to provide testimony on subjects that are beyond the common sense, experience and education of the average juror. *State v. Ellington*, 151 Idaho 53, 66, 253 P.3d 727, 740 (2011). Therefore, expert testimony is inadmissible if it merely draws conclusions or opinions that the average juror is qualified to draw from the facts utilizing the juror's common sense and normal experience. *Id.*

Here, the district court concluded that the expert would not be permitted to testify regarding the meaning of the swastika on the side of the truck, or on the meaning of Ira's tattoos, including the words "Aryan Pride," because the jury could understand the meaning of those symbols and tattoos without the help of an expert. However, the district court permitted expert testimony regarding common meanings of the "SS" lightning bolts and the three-leaf clovers displayed in William's tattoos because the association between those symbols and white supremacist groups was less well known to the public.

We find no error in this ruling. Although many jurors, particularly those of the "baby boomer" generation or older, know that "SS"[7] refers to a police and military corps of Adolph Hitler's Nazi party, other average jurors might not have that knowledge; and even those who recognize the initials "SS" as a reference to Nazism might not understand that the lightning bolt tattoo symbolizes the SS. Likewise, the significance of the three-leaf clover symbols may have been unknown to any of the jurors. Therefore, the district court's decision to admit the expert testimony was a proper exercise of its discretion.

---

[7]     "SS" was an abbreviation for the Schutzstaffel.

**B.      Severance**

Tankovich also asserts that the district court erred by denying his pretrial motion to sever his trial from that of William. A motion to sever is directed to the trial court's discretion and this Court will not overturn a denial of the motion unless the trial court has abused its discretion. *State v. Eguilior*, 137 Idaho 903, 907, 55 P.3d 896, 900 (Ct. App. 2002). When reviewing an order denying a severance motion, the inquiry on appeal is whether the defendant has presented facts demonstrating that unfair prejudice resulted from a joint trial. *Id.* at 908, 55 P.3d at 901; *State v. Cirelli*, 115 Idaho 732, 734, 769 P.2d 609, 611 (Ct. App. 1989).

Here, Tankovich's claim of unfair prejudice mirrors his argument regarding the admissibility of the evidence of William's and Ira's tattoos. However, as discussed above, the evidence was admissible against Tankovich, and he was not unfairly prejudiced by its introduction. Tankovich has not asserted that the joinder of his trial resulted in any other form of prejudice. Therefore, the district court did not abuse its discretion by denying Tankovich's motion to sever his trial from William's.

**C.      Sufficiency of the Evidence**

Finally, Tankovich asserts that the evidence was insufficient to support the jury verdict because the evidence would be equally consistent with a finding that Tankovich and his brothers were not harassing Kenneth because of his race when they returned to his house with a gun and a pit bull but, instead, were reacting to Kenneth's earlier display of a gun.

Appellate review of the sufficiency of the evidence is limited in scope. In assessing the sufficiency of evidence, we will uphold a judgment of conviction entered upon a jury verdict so long as there is substantial evidence upon which a rational trier of fact could conclude that the prosecution proved all essential elements of the crime beyond a reasonable doubt. *State v. Severson*, 147 Idaho 694, 712, 215 P.3d 414, 432 (2009). Evidence is substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proven. *Id.* On appeal, this Court must view the evidence in the light most favorable to the prosecution. *State v. Sheahan*, 139 Idaho 267, 286, 77 P.3d 956, 975 (2003). We will not substitute our own judgment for that of the jury on matters such as the credibility of witnesses, the weight to be given to certain evidence, and the reasonable inferences to be drawn from the evidence. *Severson*, 147 Idaho at 712, 215 P.3d at 432.

On review of the trial record, we find ample evidence to support the jury's finding that Tankovich was motivated by racial animus. The evidence shows that when Tankovich initially saw Kenneth, he was driving a truck with a swastika, a universally-recognized symbol of white supremacy, drawn on the side. Tankovich skidded the truck to a stop and reversed it to return to a position near Kenneth, and all of the Tankoviches exited the vehicle and began to approach Kenneth in an aggressive manner. Tankovich began yelling at Kenneth. Kenneth found their manner at that point to be sufficiently threatening that he asked his wife to fetch a gun and call police. This evidence shows that Tankovich's hostility toward Kenneth and his intimidating actions began *before* Kenneth displayed a firearm, and therefore could not have been in response to or motivated by Kenneth's act of arming himself. When the Tankoviches returned approximately thirty minutes later, William and Tankovich approached from one direction with a pit bull, and Ira approached from another, carrying a gun and a knife. When the police arrived, Tankovich and William refused to leave for more than an hour, during which Tankovich yelled racial slurs while looking or pointing at Kenneth, yelled that he was going to "get that f--kin' beaner." Racial slurs that the Tankoviches used, the swastika on the truck, and the racist tattoos sported by Tankovich's brothers all support a finding that their harassment of Kenneth was racially motivated. Based on this evidence, a rational trier of fact could conclude that the prosecution proved that Tankovich conspired with his brothers to maliciously harass Kenneth, and that he executed that plan when he returned with his brothers to Kenneth's home and yelled threatening comments and racial slurs.

### III.
### CONCLUSION

Tankovich has shown no error by the trial court in the admission of evidence or in the court's refusal to sever Tankovich's trial, and the trial evidence was sufficient to support the jury's finding that Tankovich was guilty of the charged offenses. Therefore, the judgment of conviction is affirmed.

Chief Judge GUTIERREZ and Judge GRATTON **CONCUR.**