NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12953


COMMONWEALTH  vs.  ADRIAN HINDS.



Hampden.      January 6, 2021. - April 20, 2021.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.



Assault and Battery by Means of a Dangerous Weapon.  Evidence,
    Expert opinion, Motive, Hearsay.  Witness, Expert.  Jury
    and Jurors.  Practice, Criminal, Jury and jurors,
    Examination of jurors, Challenge to jurors, Hearsay.




    Indictments found and returned in the Superior Court
Department on April 27, 2016.

    The cases were tried before David Ricciardone, J.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Elaine Fronhofer for the defendant.
    Joseph G.A. Coliflores, Assistant District Attorney, for
the Commonwealth.
    Rebecca Kiley, Committee for Public Counsel Services, for
Committee for Public Counsel Services, amicus curiae, submitted
a brief.
    Michael Tumposky, for Massachusetts Association of Criminal
Defense Lawyers, amicus curiae, submitted a brief.

LOWY, J.  In March 2016, the defendant, Adrian B. Hinds, fought with Miranda Arthur-Smith and Nathaniel Cherniak.  As a result, the defendant was indicted on two counts of assault and battery by means of a dangerous weapon resulting in serious injury, G. L. c. 265, § 15A (c) (i).[1]  The defendant, who is black, claimed that Cherniak, who is white, had initiated the attack out of racial animus and that the defendant acted in self-defense.

To support this argument, the defendant proposed having two experts testify at trial about the cultural significance of a symbol that Cherniak had tattooed on his arm.  The defendant alleged that the symbol -- which he claimed was the number 211 -- was affiliated with groups that espoused white supremacist ideology.[2]  After holding voir dire for each expert, the judge excluded both experts on reliability grounds under the Daubert-Lanigan standard.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 585-595 (1993).  See also Commonwealth v. Lanigan, 419

---

[1] The defendant also was indicted on two counts of armed assault with intent to murder, G. L. c. 265, § 18 (b), one count of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b), and one count of cruelty to an animal, G. L. c. 272, § 77.  At trial, the judge dismissed for insufficient evidence so much of the G. L. c. 265, § 15A (b), charge as alleged that the assault and battery occurred by means of a dangerous weapon, and the jury found the defendant not guilty of the remaining charges.

[2] Whether the symbol was the number 211 was disputed at voir dire by the Commonwealth.

Mass. 15, 25-26 (1994).  At trial, the Commonwealth alleged that the defendant attacked Arthur-Smith and Cherniak without justification.  The defendant subsequently was convicted on both counts of assault and battery by means of a dangerous weapon resulting in serious injury.

On appeal, we consider, among other issues, whether the judge erred in excluding the defendant's experts.  We conclude that the judge abused his discretion in excluding one of the experts.  Because this error was prejudicial, we reverse and remand for a new trial.[3]

Background.  We summarize the evidence at trial, reserving certain facts for our discussion of the issues.  We start by noting what was undisputed.  The defendant and the victims knew each other before the fight.  At the time of the incident, the defendant lived with his mother in the same Westfield apartment building as Arthur-Smith and Cherniak, who lived together. Indeed, the defendant and Cherniak were even friendly with one another, but the friendship ended approximately six months before the fight that gave rise to this case.  As will become apparent, the parties agreed on few other details.

---

[3] We acknowledge the amicus briefs from the Committee for Public Counsel Services and Massachusetts Association of Criminal Defense Lawyers.

1. <u>The Commonwealth's case</u>. Cherniak testified that his relationship with the defendant soured when the defendant accused him of being with the Russian mafia, a Mexican cartel, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and of being an undercover agent of the Drug Enforcement Administration. Cherniak further testified that several days before the altercation, the defendant confronted him in the apartment building with a hammer and said that Cherniak was going to be sent to a concentration camp.

Arthur-Smith testified that the altercation began when she was pushed to the ground after leaving the apartment building to head to her car. She felt something strike the back of her head and, after turning over, recognized the defendant as the attacker. She testified that the defendant struck her from four to five times with a hammer. Arthur-Smith claimed that the defendant smelled as if he had not bathed in some time and that during the attack the defendant said to her: "That's for messing with my mother." As the attack ensued, Arthur-Smith yelled out Cherniak's name.

Cherniak testified that upon hearing Arthur-Smith yelling his name, he left their apartment with a knife. When Cherniak opened the front door of the building, he saw the defendant standing over Arthur-Smith, who was bleeding. At that point, Arthur-Smith's pet dog ran out of the building, causing Arthur-

Smith to stand up to chase the dog. The defendant went inside the building. Cherniak, too, went inside, heading back to his apartment to retrieve pepper spray; he then returned outside. Thereafter, the defendant went back outside, hammer again in hand. Cherniak sprayed the defendant with the pepper spray, and the defendant struck Cherniak with the hammer several times. After this, the defendant entered his car and drove away.

2. The defendant's case. The defendant offered a different version of events. To begin, the defendant testified that while living in the Westfield apartment building, both he and his mother experienced several racially charged incidents and that their cars' tires had been slashed while parked near the apartment complex.[4] The defendant did not testify that Cherniak was behind these incidents. He did, however, testify that his friendship with Cherniak ended when Cherniak repeatedly asked the defendant to sell drugs for him, assuming that the defendant was a drug dealer because, as the defendant testified that Cherniak said, "You're black, you drive a Porsche, and you're only twenty-something years old." Further, the defendant

---

[4] The defendant testified that he contacted the police about the vandalism done to his car. An officer testified at trial that he had responded to a report of vandalism to the car but believed that the alleged slash marks on the tires were consistent with damage to the rim from driving over potholes.

testified that Cherniak told the defendant that he had been a member of a "biker club" or "gang" in New York City.[5]

In contrast to Cherniak and Arthur-Smith's testimony, the defendant testified that the altercation began when he heard a loud bang outside his apartment, which the defendant believed was the door to the building slamming shut. The defendant was in the shower when he heard the noise.[6] Because his car previously had been vandalized, he looked out the window to check on it. From his apartment window, the defendant saw Arthur-Smith and Cherniak standing near his car and Cherniak using a knife to slash his rear tire.[7] Seeing that Cherniak had a knife, the defendant grabbed a hammer before leaving his apartment.

The defendant testified that he verbally confronted Arthur-Smith and Cherniak when they returned inside the apartment building. Standing in the building's hallway, Cherniak

---

[5] Nathaniel Cherniak denied telling the defendant that he was in a gang.

[6] When an officer investigated the defendant's apartment after the altercation, he found the shower was still running.

[7] The size of the knife was disputed. After the fight, the police did not ask to see, collect, or photograph the knife. Instead, Miranda Arthur-Smith brought the knife into the police station two weeks before trial. The defendant alleged that the knife Arthur-Smith brought to the police station was not the one Cherniak had used. Instead, the defendant claimed it was smaller than the one used by Cherniak in the fight, which had approximately a sixteen-inch blade.

responded to the defendant by saying something to the effect of "What are you going to do about it?" Arthur-Smith then sprayed the defendant with pepper spray, making it difficult for the defendant to keep his eyes open. The defendant saw Cherniak pull out a knife. The defendant then went toward the door leading outside, swinging his hammer as he went. Arthur-Smith sprayed the defendant as she backed out through the exterior door. As the defendant reached the steps that led down from the building's exterior door, he heard what sounded like someone falling. Cherniak then followed the defendant out of the building and started to slash his knife at the defendant. In return, the defendant swung his hammer at Cherniak, making contact with him several times. When the defendant realized that he could get by Cherniak and reenter the building, he did so, returning to his apartment.[8]

Once inside, the defendant testified that he decided to try to find his mother, who was not home at the time, and to warn her about what had happened.[9] The defendant brought his hammer with him as he went back outside. When the defendant left the

___

[8] Arthur-Smith denied spraying the defendant with pepper spray and claimed not to have seen any damage to the tires of the defendant's car. Cherniak likewise denied slashing the defendant's tires.

[9] The defendant claims that he did not try to telephone his mother because she had not been answering her telephone that day.

building, Cherniak was standing near the defendant's car. Cherniak sprayed the defendant with the pepper spray, and the defendant responded by swinging the hammer towards Cherniak. The defendant made contact with Cherniak, causing him to stop spraying the pepper spray. The defendant then got into his car and drove away, eventually pulling over due to the damage to one of his tires.[10]

3. Percipient witnesses. Although there were three other percipient witnesses who saw parts of the fight and testified at trial, none of these witnesses saw who the initial aggressor was. The first witness, who was located near the parking lot at the time, testified that he saw the defendant standing over Arthur-Smith outside the building and then Cherniak running outside. That witness did not hear Arthur-Smith yell Cherniak's name. The second witness, who was inside her apartment at the time, testified to hearing a commotion outside and seeing a black man and a white man fighting when she looked out her window.

Finally, the third witness testified that from inside her apartment she heard scuffling, grunting, and loud talking, though not yelling. After looking out a window, which looked directly out over the parking lot, she saw a black man and a

---

[10] The officer who found the car confirmed that one of its rear tires had "sustained some significant damage."

white man fighting and a woman running after a dog.  She further saw the black man go back into the apartment building, then return outside with a hammer.  At this point, the white man sprayed the black man with something, and the black man hit the white man in the head with the hammer.  After fighting, the black man got in his car and drove away.

4.  Procedural history.  The jury found the defendant guilty on two indictments charging assault and battery by means of a dangerous weapon resulting in serious bodily injury, G. L. c. 265, § 15A (c) (i).  The defendant appealed, and we transferred the case to this court sua sponte.

Discussion.  1.  Expert testimony.  At trial, the defendant argued that he acted in self-defense.  The defendant's theory of the case was that Cherniak and Arthur-Smith were motivated to attack him by racial animus.  Corroborating this theory was a tattoo Cherniak had on his arm.  The defendant argued that the tattoo was of the number 211 and that this symbol was used by both the 211 Crew -- a white supremacist prison gang -- and the 211 Bootboys -- a white supremacist group operating out of New York City.  According to the defendant, Cherniak's tattoo signaled his affinity to beliefs espoused by these groups.  To support this theory, the defendant sought to introduce the testimony of two experts:  Dr. Sophie Bjork-James, who has a doctorate in cultural anthropology and studies the white

nationalist movement, and Dr. Jesse De La Cruz, who has a doctorate in educational leadership and is an expert on gangs. Each would testify that Cherniak's tattoo was affiliated with a group that espoused white supremacist beliefs.

The judge excluded both experts on reliability grounds. On appeal, the defendant argues that the judge's decisions to exclude De La Cruz and Bjork-James's expert testimony were abuses of discretion. We agree as to Bjork-James's testimony but not as to De La Cruz's testimony.

"The role of expert testimony is to assist jurors in interpreting evidence that lies outside their common experience." Commonwealth v. Shanley, 455 Mass. 752, 761 (2010). Admission of such testimony is "governed by what has come to be known as the Daubert-Lanigan standard."[11] Commonwealth v. Camblin, 478 Mass. 469, 475 (2017). See Mass. G. Evid. § 702 & comments (2021). To satisfy this standard, expert testimony must both "rest[] on a reliable foundation" and

_____

[11] Expert testimony also may be admitted under the standard set out in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). See Commonwealth v. Patterson, 445 Mass. 626, 640 (2005), overruled on other grounds by Commonwealth v. Britt, 465 Mass. 87 (2013) (Frye standard requires "theory and methodology in question to be generally accepted by a relevant scientific community"). See also Commonwealth v. Powell, 450 Mass. 229, 238 (2007) ("Where general acceptance is not established by the party offering the expert testimony, a full Daubert analysis provides an alternate method of establishing reliability" [citation omitted]). At oral argument, however, the defendant conceded that the Daubert-Lanigan standard applies in this case.

be "relevant to the task at hand." Daubert, 509 U.S. at 597. See Commonwealth v. Polk, 462 Mass. 23, 32 (2012).

Within this framework, "[t]he judge is the gatekeeper of the evidence" and must make a threshold determination that the testimony is both relevant and "sufficiently reliable to go before the jury." Commonwealth v. Hoose, 467 Mass. 395, 417 (2014). Whether the methodology applied by the expert satisfies gatekeeper reliability is a preliminary question of fact upon which admissibility depends on the judge to determine. Mass. G. Evid. § 104(a) (2021). The judge does not, however, determine whether to credit the expert's ultimate opinion; this is a matter of weight for the jury to decide. See Commonwealth v. Roberio, 428 Mass. 278, 281 (1998), S.C., 440 Mass. 245 (2003) ("Once the expert's qualifications were established and assuming the expert's testimony met the standard of . . . Lanigan, . . . the issue of credibility was for a jury, not the judge").

"We review a judge's determination to admit or exclude expert testimony under Daubert-Lanigan for an abuse of discretion." Commonwealth v. DiCicco, 470 Mass. 720, 729 (2015). See Canavan's Case, 432 Mass. 304, 312 (2000). Although "our review under this standard is deferential and limited, it is not perfunctory. A judge's findings must apply the correct legal standard to the facts of the case and must be supported by an examination of the record." Commonwealth v.

Patterson, 445 Mass. 626, 639 (2005), overruled on other grounds by Commonwealth v. Britt, 465 Mass. 87 (2013). See Commonwealth v. Crawford, 429 Mass. 60, 66 n.13 (1999). Our analysis begins with the issue of relevance.

a. Relevance. We begin by recognizing that the judge did not base his ruling as it relates to either defense expert on relevance grounds. Nor did either the Commonwealth or the defendant raise the issue of relevance at trial or on appeal.[12] Nevertheless, a proper understanding of the relevance of the expert testimony at issue here is crucial. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153-154 (1999) (judges must determine whether expert's testimony reliably speaks to issue for which it is offered to prove). Relevance is the first rule of evidence; it is where our analysis must begin. See State v. Goodson, 281 Kan. 913, 922 (2006) ("A determination of relevance is the first step in analyzing if evidence is admissible"). Failure to grapple fully with the relevance of the defendant's expert testimony may have led the parties and the judge astray. Consequently, we start our inquiry here.

The judge appears to have assumed that at least Bjork-James's opinion was relevant in part to show that Cherniak belonged to a gang. This was not and is not the defendant's

---

[12] The defendant, however, was asked about the issue at oral argument.

theory.  Instead, the defendant argued that Arthur-Smith and Cherniak attacked him first, and that the incident was a "race-based attack and that he acted in self-defense."  To this end, De La Cruz and Bjork-James's testimony was relevant not to show that Cherniak belonged to a gang, but rather that he may have had some affinity for white supremacist ideology, regardless of whether he was actually a member of any gang or white supremacist group.  In short, De La Cruz and Bjork-James's testimony went to whether Cherniak was motivated to attack the defendant based on his alleged white supremacist beliefs.[13]

"The relevance threshold for the admission of evidence is low."  Commonwealth v. Arroyo, 442 Mass. 135, 144 (2004).  To be relevant, the proposed evidence need only have a tendency to make a material fact more or less probable that it would be without the evidence.  See Commonwealth v. Moore, 480 Mass. 799, 808 (2018); Mass. G. Evid. § 401 (2021).

In light of these considerations, "evidence of motive need not be conclusive"; instead, "it need only provide a link in the chain of proof."  Commonwealth v. Watt, 484 Mass. 742, 748 (2020).  Courts routinely have admitted evidence concerning

---

[13] At one point, the judge appeared to acknowledge this, noting that "the Defendant has a theory that the Complainant's a white supremacist and that this led to him being attacked."

tattoos to show motive.[14]  See, e.g., <u>People</u> v. <u>Valdez</u>, 55 Cal. 4th 82, 131 (2012), cert. denied, 569 U.S. 948 (2013) (evidence of tattoo relevant to show motive); <u>Wolfe</u> v. <u>State</u>, 273 Ga. 670, 673-674 (2001) (same); <u>State</u> v. <u>Tankovich</u>, 155 Idaho 221, 225-226 (2013) (tattoos relevant to racial motive of both defendant bearing them and codefendant in malicious harassment case); <u>People</u> v. <u>James</u>, 348 Ill. App. 3d 498, 509-510 (2004), cert. denied, 544 U.S. 910 (2005) (evidence of tattoo relevant to show motive).  See also <u>People</u> v. <u>Slavin</u>, 1 N.Y.3d 392, 395, cert. denied, 543 U.S. 818 (2004) ("tattoos may have reflected defendant's inner thoughts").  Cf. <u>Commonwealth</u> v. <u>Sylvia</u>, 456 Mass. 182, 188-189 (2010) (that prosecutor reasonably expected to elicit evidence supporting comment made during opening statement about how tattoo of victim's name on defendant's neck might provide possible motive for murder was supported by record).

If credited, Bjork-James's or De La Cruz's testimony would have provided evidence that Cherniak's tattoo was associated with a group that espouses white supremacist beliefs.  Combined with the defendant's testimony about the racially charged

---

[14] Analogous reasoning also has supported entering in evidence gang-affiliated clothes and symbols in order to demonstrate motive.  See, e.g., <u>Commonwealth</u> v. <u>Lopes</u>, 478 Mass. 593, 604 (2018) ("testimony that the defendant had been seen wearing clothing that bore an 'H' [signifying Homes Ave. gang membership] was relevant in proving the defendant's motive").

statements that Cherniak made to him and which allegedly ended their friendship, and presuming the jury found that the Cherniak's tattoo was a "211," the expert testimony would have provided the jury with a link between the tattoo and a motive for Cherniak to attack the defendant.[15]  Thus, the proffered testimony was relevant.

b.  Reliability.  Under the Daubert-Lanigan standard, "the touchstone of admissibility is reliability."  DiCicco, 470 Mass. at 729, quoting Commonwealth v. Vao Sok, 425 Mass. 787, 796 (1997).  See Lanigan, 419 Mass. at 26.  To this end, the proponent of the expert testimony must establish, among other factors, that the testimony is "based on facts or data of a type reasonably relied on by experts to form opinions in the relevant field," that the testimony is based on a reliable methodology, and that methodology "is applied to the particular facts of the case in a reliable manner."[16]  Commonwealth v. Barbosa, 457 Mass.

_____

[15] We previously have held "that evidence of a victim's prior violent conduct may be probative of whether the victim was the first aggressor where a claim of self-defense has been asserted and the identity of the first aggressor is in dispute." Commonwealth v. Adjutant, 443 Mass. 649, 650 (2005).  Because the defendant offers the evidence for the nonpropensity purpose of motive, and because the Commonwealth did not object on the ground of impermissible character evidence, we need not examine any further implications that arise from Adjutant.

[16] The proponent of the expert testimony also must demonstrate that the witness is qualified as an expert and that the witness's testimony will assist the jury.  Commonwealth v.

773, 783 (2010), cert. denied, 563 U.S. 990 (2011).  See Mass. G. Evid. § 702 (requirements for admission of expert testimony).

     i.  Soft sciences.  Both of the defendant's proffered experts are social scientists.  Commentators often refer to disciplines like these as "soft sciences."  See, e.g., Goodman, A Hedgehog on the Witness Stand -- What's the Big Idea?:  The Challenges of Using Daubert to Assess Social Sciences and Nonscientific Testimony, 59 Am. U. L. Rev. 635, 641 (2010). Before assessing either Bjork-James's or De La Cruz's testimony, we take this opportunity to comment on the application of Daubert-Lanigan to the soft sciences.

     Whereas experts in the "hard sciences" primarily base their findings on repeatable experiments conducted under controlled conditions, experts in the "soft sciences" base their findings largely on nonrepeatable observations.  See generally Brodin, Behavioral Science Evidence in the Age of Daubert:  Reflections of a Skeptic, 73 U. Cin. L. Rev. 867, 869 (2005).  At times, we have suggested that the Daubert-Lanigan standard differs when applied to "soft" sciences as when compared to how it is applied to "hard" sciences.  See, e.g., Canavan's Case, 432 Mass. at

---

Barbosa, 457 Mass. 773, 783 (2010), cert. denied, 563 U.S. 990 (2011).  Because the Commonwealth concedes that the testimony of De La Cruz and Bjork-James would have aided the jury, we do not discuss this factor further.  Insofar as the qualifications of Bjork-James are at issue, we discuss that at note 23, infra.

311-312.  See also Mass. G. Evid. § 702 & comments  ("The application of the Daubert-Lanigan factors in cases involving the 'hard' sciences may not apply in the same way in cases involving the 'soft' sciences").  This suggestion recognizes an important truth.  The soft sciences are not entitled to less consideration than their hard science counterparts, but the methodologies of each do differ.  Our law of evidence reflects this point.

The Daubert-Lanigan standard initially was developed to assure the reliability of expert testimony based on hard sciences like pharmacology and deoxyribonucleic acid (DNA) testing.  See Daubert, 509 U.S. at 583.  See also Lanigan, 419 Mass. at 16.  These origins guided the United States Supreme Court in Daubert to identify what factors courts should consider when determining whether an expert's methodology is reliable.  See generally Brodin, 73 U. Cin. L. Rev. at 871-873.  Specifically, courts should consider (1) whether the method "can be (and has been) tested," (2) whether it "has been subjected to peer review and publication," (3) its "known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the method has achieved "general acceptance" within the relevant community.  Daubert, supra at 593-594.

These nonexclusive factors, however, are not easily imposed on the methodologies used by the soft sciences.  Because different subject matters allow for varying degrees of certainty, the metrics used to assess reliability understandably vary across areas of expertise.  See Reinhard, "Sociological Gobbledygook":  Gill v. Whitford, Wal-Mart v. Dukes, and the Court's Selective Distrust of "Soft Science," 67 U.C.L.A. L. Rev. 700, 747 (2020) ("Soft sciences[, unlike hard sciences,] are stuck in an unending state of 'maybe,' or 'yes, but only in the event that --' or 'it depends'").  See also Commonwealth v. Pytou Heang, 458 Mass. 827, 847-849 (2011) (different levels of certainty where expert's discipline "is clearly as much an art as a science").  For this reason, different "types of methodology may require judges to apply differing evaluative criteria to determine whether scientific methodology is reliable."[17]  Canavan's Case, 432 Mass. at 314 n.5.  See Kumho Tire Co., 526 U.S. at 150 ("[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets

---

[17] Conversely, once an expert's testimony based on soft science is admitted, it also is important for jurors to understand that it is not hard science.  See Commonwealth v. Torres, 469 Mass. 398, 407 (2014) ("Of particular concern is the danger that the jury is misled into an understanding that the 'science' at hand is 'hard' science, when in fact it is 'soft' science").

of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue"); Ernest E. v. Commonwealth, 486 Mass. 183, 190-191 (2020) (application of Daubert-Lanigan to soft sciences).

In other words, "[n]ot all of the factors identified in Daubert[-Lanigan] will be applicable in every case." Palandijan v. Foster, 446 Mass. 100, 111 (2006). Consequently, while Daubert-Lanigan establishes "various guideposts for determining admissibility including general acceptance, peer review, and testing," we have also stressed that "[e]stablishing the reliability of personal observations may in some circumstances require examining other criteria." Canavan's Case, 432 Mass. at 314 n.5. Therefore, in order to respect the methodological distinctions that divide soft from hard sciences, application of the Daubert-Lanigan standard to soft sciences requires flexibility with special attention being paid to the criteria of reliability that different disciplines develop.[18] Id. See Goodman, 59 Am. U. L. Rev. at 680 ("Ultimately, courts should develop a suitable set of factors to test a particular social

---

[18] Assessing the reliability of the methodology employed by an expert's testimony in light of the standards developed within the relevant field also helps to avoid what some commentators have labeled as "selective distrust" of the soft sciences. See Reinhard, 67 U.C.L.A. L. Rev. at 708.

science methodology"). With these considerations in mind, we turn to the case at hand.

ii. *Defendant's experts*. In excluding Bjork-James, the judge found that the methodology employed by Bjork-James to connect the number 211 to white supremacist gangs was unreliable. In excluding De La Cruz's testimony connecting Cherniak's tattoo to white supremacist gangs, the judge found that the testimony was based on insufficient facts, that it was not based on reliable methods, and that De La Cruz did not reliably apply these methods to the facts of the case. We agree with the defendant that the decision to exclude Bjork-James was an abuse of discretion, but we disagree with the same argument concerning De La Cruz.[19]

A. *Bjork-James*. During voir dire, Bjork-James testified that her method of analysis was based on ethnography, which is premised on observing people in their everyday locations in order to understand society from their point of view, and media studies, which focuses on the cultural significance people

---

[19] The Commonwealth does not challenge, and the judge did not rule on, the underlying basis of either De La Cruz or Bjork-James's testimony. See Mass. G. Evid. § 703 (2021). Consequently, we do not inquire further into whether the sources used by these experts pass muster under our law of evidence. Cf. Commonwealth v. Watt, 484 Mass. 742, 746 (2020) ("Expert testimony must be based on facts within the witness's direct personal knowledge, facts already introduced in evidence, or unadmitted but independently admissible evidence" [quotations and citation omitted]).

afford media.[20]  Bjork-James drew from these approaches in her research into the white supremacist movement's development on the Internet.[21]  To this end, she studied online postings on known white supremacist websites.  When she found a post that users of the website commented on, or one that shared themes[22] with other posts, she would keep track of the information contained therein.  When neither of these factors was present, Bjork-James would disregard the post.  In this way, Bjork-James identified themes that emerged among various posts she studied.

One pattern that Bjork-James noticed as part of her academic research was the use of numbers among white nationalist groups to identify themselves.  Among these numbers was the number 211, which Bjork-James tracked as recurring among online posts about a record label whose bands were affiliated with the white supremacist movement and that had ties to the 211

---

[20] Although not dispositive of either term's meaning within the discipline of cultural anthropology, "ethnography" is also defined as "[t]he scientific description of the customs of individual peoples and cultures," Lexico, https://www.lexico.com/en/definition/ethnography [https://perma.cc/H28R-4FYH], whereas "media studies" is defined as "[t]he study of the mass media as an academic subject," Lexico, https://www.lexico.com/en/definition/media_studies [https://perma.cc/V5SP-L8ND].

[21] Bjork-James had been studying the white supremacist movement since 2004.  During that time, she had published her findings in several academic journals as well as in a peer-reviewed manuscript.

[22] "Themes" is an academic term in this context and signifies a focus on recurring information and patterns.

Bootboys, a group harboring white supremacist beliefs. Bjork-James used reports authored by the Southern Poverty Law Center and the Anti-Defamation League to confirm the connection between bands and the white supremacist movement. When asked by defense counsel during voir dire whether she knew of any other cultural significance of the number "211" outside of the white supremacist movement, Bjork-James responded that she did not.

The judge credited Bjork-James's testimony concerning how tattoos and symbols are used by individuals to signal affinities with white supremacist groups.[23] The judge even found that "as a matter of cultural anthropology," Bjork-James knew of "no other use of the number '211,' except in reference to 211 Crew or 211 Bootboys." Despite that, the judge concluded that the defendant presented "no reliable methodology to support alleged expert testimony that the Complainant's tattoo is connected to a white supremacist group or ideology."

---

[23] Despite basing his ruling on methodology rather than qualifications, the judge also found that Bjork-James was not an expert in tattoos, noting that "[s]he does claim some expertise in symbols, but only in a broad sense as they pertain to white supremacist and similar groups." However, Bjork-James was being offered as an expert on symbols, an area in which the judge found she was qualified. Insofar as the judge factored Bjork-James's lack of expertise in tattoos into his analysis, this was error. See Commonwealth v. Mahoney, 406 Mass. 843, 852 (1990) ("There is no requirement that testimony on a question of discrete knowledge come from an expert qualified in that subspecialty rather than from an expert more generally qualified").

Although "conclusions and methodology are not entirely distinct from one another," General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997), a judge acting as gatekeeper must limit his or her analysis to the reliability of an expert's methodology, not the persuasiveness of the conclusion. See Daubert, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate"). "Of course, if the judge rules the opinion evidence admissible, that ruling is not final on the reliability of the opinion evidence." Lanigan, 419 Mass. at 26. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Commonwealth v. Sliech-Brodeur, 457 Mass. 300, 328 n.40 (2010), quoting Daubert, supra at 596. See Commonwealth v. Torres, 469 Mass. 398, 407 (2014) ("How the expert proceeds with the application of [a method] is usually fertile ground for cross-examination"). In other words, an expert may have a reliable method and still fail to persuade a jury of his or her conclusions. But acting as gatekeeper, the judge must leave the determination of the credibility of the expert and the weight to be attributed to the expert's testimony to the trier of fact.

Here, the judge incorrectly focused on the persuasiveness of Bjork-James's conclusions, not the reliability of her

methodology. Furthermore, the judge appears to have focused on the wrong conclusions. When evaluating Bjork-James's analysis of the number 211 and its use by white supremacist groups, the judge found that the examples used by Bjork-James to draw this link "do not match the distinctive font of the Complainant's tattoo." For this reason, the judge found that "the alleged connection between the Complainant's tattoo and him espousing any racist ideology is too specious to pass muster under" the Daubert-Lanigan standard.[24] Yet the defendant offered Bjork-James not to tie Cherniak or his tattoo specifically to the white supremacist movement, but rather to provide testimony on the significance of the number 211 to the principles of white supremacy more generally.[25] Assuming the jury found that Cherniak's tattoo was of the number 211, Bjork-James's testimony would have been relevant as to whether the tattoo indicated any affinity of his with the white supremacist movement. Jurors

---

[24] During its closing at Bjork-James's voir dire, the Commonwealth also emphasized that the link between the cultural anthropologist's testimony and Cherniak's tattoo was absent. To this end, the Commonwealth argued that Bjork-James could not "definitively" say that Cherniak's tattoo was a 211 symbol.

[25] Defense counsel stressed this point during Bjork-James's voir dire, arguing that although the jury could believe that Cherniak's tattoo was something other than a 211, if the jury thought it was that number then the cultural anthropologist's testimony was "relevant because [Cherniak] has a symbol on his body that [Bjork-James] says is one of the symbols that circulates among [white supremacist] groups."

reasonably could have inferred either that Cherniak did or did not share the movement's insidious beliefs.

Put differently, Bjork-James's testimony was conditionally relevant on the jury finding that Cherniak's tattoo was of the number 211. See Mass. G. Evid. § 104(b). The judge's role in this regard was to determine whether a jury could reasonably find by a preponderance of the evidence that Cherniak's tattoo was the number 211. See Commonwealth v. Ware, 482 Mass. 717, 729 n.16 (2019), quoting Commonwealth v. Meola, 95 Mass. App. Ct. 303, 308 n.13 (2019) ("A judge, when addressing an issue of conditional relevance, does not decide whether he or she believes that the item being offered in evidence is what it is purported to be. Rather, the judge decides whether a trier of fact 'could reasonably find the conditional fact . . . by a preponderance of the evidence'"). In determining that Cherniak's tattoo did not match the font of the samples on which Bjork-James's testimony relied and was thus not related to the beliefs espoused by white supremacists, the judge intruded on the role of the jury.[26]

---

[26] An analogous situation would be where an expert is analyzing whether DNA on a victim's shirt was that of a defendant. The judge's role there would be to assess the reliability of the science, not to determine whether the shirt was worn by the victim. Rather, the judge would determine whether a jury could reasonably decide by a preponderance of the evidence that the shirt was worn by the victim. See Mass. G. Evid. § 104(b).

"Numerous decisions in federal and other state cases also have upheld the admission of expert testimony to explain the culture and beliefs of White supremacy groups and gangs and to interpret tattoos, symbols, and graffiti associated with these groups when such evidence was relevant to the issues at trial." People v. Lindberg, 45 Cal. 4th 1, 46-47 (2008), cert. denied, 557 U.S. 908 (2009).  In testifying about this culture, Bjork-James applied the sort of comparative methodology commonly used by social scientists beyond the court room setting.  See, e.g., United States v. Young, 916 F.3d 368, 380-381 (4th Cir.), cert. denied, 140 S. Ct. 113 (2019) ("'collect[ing] as much information as possible,' then balancing 'each new incoming piece of information against the body of information you've built to that point'" is method "generally employed in the social sciences" [citation omitted]); United States vs. Paracha, U.S. Dist. Ct., No. 03 CR. 1197(SHS), slip op. at 35 (S.D.N.Y. Jan. 3. 2006) (determining as reliable methodology "gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information to determine whether his conclusions remain consonant with the most reliable sources").  See also Goodman, 59 Am. U. L. Rev. at 681 ("Because so much of social science . . . is based on document selection and interpretation, courts

should focus on this factor in assessing a social science expert's methodology" [footnote omitted]).

Therefore, it was an abuse of discretion to exclude Bjork-James's testimony concerning the cultural significance of the number 211. The defendant offered the anthropologist's testimony to provide the jury with the basis to infer that Cherniak shared the white supremacist beliefs that Bjork-James's research linked to the number 211, and that these beliefs in turn motivated Cherniak to initiate the fight at issue. Although the defendant certainly could have articulated this theory more precisely to the judge, the judge imposed too high a burden on the testimony's admissibility, asking that it persuade him of factual conclusions rather than merely demonstrate a reliable methodology. Cf. Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 358 (2008) ("In excluding even the portion of Shapiro's report and testimony that consisted of counting data found in Wal-Mart's own business records, the motion judge acted not on the basis of any challenge to Shapiro's methodology, but essentially on his view that the records themselves were insufficiently reliable"). This was error.

B. De La Cruz. The same is not true for De La Cruz. Whereas Bjork-James outlined a reliable method for assessing symbolism, De La Cruz did not. Although De La Cruz did discuss the methods used by sociologists to understand how gangs

identify themselves at one point, he did so in general terms, discussing the difference between quantitative and qualitative analysis in a manner untied to a specific methodology.  Even if invoking these terms in the abstract would be sufficient to identify a method at work here, De La Cruz did not discuss specifically how these different approaches guided his own research, instead giving the impression that these were approaches in which he was trained.  Such academic training "might have taught him a methodology, [but] it is not itself a methodology."  Commonwealth v. Franceschi, 94 Mass. App. Ct. 602, 610 (2018).

Furthermore, when asked how he had researched the meaning of the number 211, De La Cruz recalled having come across the figure during his doctoral research.[27]  To refresh his memory, De La Cruz read twenty to twenty-five articles on the Internet about groups that used the number 211 to identify themselves. De La Cruz did note that the number was associated with white supremacist beliefs.  At no point during his voir dire, however, did De La Cruz indicate what guided his selection of the particular articles he read or his research in general.  Nor did De La Cruz provide a reliable method for determining whether a

---

[27] De La Cruz's dissertation examined gang membership; it did not appear to examine how to determine whether a symbol is associated with a gang.  The dissertation also did not appear to cover any gangs that used the number 211 to identify themselves.

symbol was affiliated with white supremacist groups.[28]  Although Daubert-Lanigan must be flexibly applied to the soft sciences, there is a breaking point.  When an opinion "is connected to existing data only by the ipse dixit of the expert," that point has long since been passed.  General Elec. Co. 522 U.S. at 146.

In sum, De La Cruz was qualified to testify about the significance of the number 211 to white supremacist gangs.  He also may have had a methodology that he could have reliably applied to uncover this significance.  But he did not articulate the foundation for such a method here.  See Kumho Tire Co., 526 U.S. at 153 (although expert was qualified, he lacked reliable methodology).  "Because the admissibility of expert testimony is a preliminary question of fact, the proponent's burden of proof to demonstrate the reliability of the expert opinion is by a preponderance of the evidence."  Camblin, 478 Mass. at 476.  See

---

[28] De La Cruz did reference a test that the United States Department of Justice uses to determine gang membership, which assign points to a subject based on how many of a set of criteria for gang membership the subject matches.  Once the subject acquires ten points, then the test considers the subject a gang member.  Based on these criteria, De La Cruz concluded that Cherniak was "definitely associated with" white supremacist groups.  However, the criteria were not developed to determine whether a symbol was associated with the white supremacist movement and instead based some of the points allotted to whether a subject had a "[k]nown gang tattoo or marking."  Whether the 211 tattoo was associated with white supremacists, however, was the reason why the defendant called De La Cruz to testify.  Consequently, it appears De La Cruz used the criteria to confirm rather than investigate the issue.

Mass. G. Evid. § 104(a). Voir dire is the time to educate the judge -- as well as create a record -- about the methods and criteria of reliability used by the proponent's expert. The defendant failed to do so for De La Cruz. Therefore, we discern no abuse of discretion in the judge's decision to exclude De La Cruz from testifying.

c. <u>Prejudicial error</u>. Regardless of the infirmities of De La Cruz's testimony, the decision to exclude Bjork-James was prejudicial error. See <u>Crawford</u>, 429 Mass. at 68. This is not a case in which, despite the exclusion of the evidence, the defendant was able to elicit "significant other testimony" concerning a key pillar of the defense. Compare <u>Commonwealth</u> v. <u>German</u>, 483 Mass. 553, 570 (2019) (exclusion of expert testimony did not prevent defendant from eliciting other evidence on witness identification); <u>Commonwealth</u> v. <u>Snyder</u>, 475 Mass. 445, 454-455 (2016) (same). Cherniak and Arthur-Smith both testified that the defendant initiated the fight. Yet without Bjork-James's testimony, the defendant's only evidence that Cherniak initiated the attack due to racial animus was his own testimony.

When the credibility of the victim's testimony is so central to the Commonwealth's case, the significance of expert testimony concerning the victim's motives for starting the fight is equally apparent. See <u>Polk</u>, 462 Mass. at 33. We cannot say that the exclusion of Bjork-James's testimony "did not influence

the jury, or had but a slight effect." Commonwealth v. Pfeiffer, 482 Mass. 110, 129, cert. denied, 140 S. Ct. 498 (2019), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). A new trial is necessary.

2. Other issues. We turn now to other issues raised on appeal that may recur on retrial.[29]

a. Jury selection. The defendant argues that he was denied a fair trial because the judge failed to make the requisite inquiry of prospective jurors and because the judge improperly declined to allow him to exercise his final peremptory challenge. We consider each argument in turn, reviewing the judge's decisions for abuse of discretion. See Commonwealth v. Seabrooks, 433 Mass. 439, 442-443 (2001).

i. Indifference inquiry. "A criminal defendant is entitled to a trial by an impartial jury pursuant to the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights." Commonwealth v. Williams,

---

[29] The defendant also appeals the judge's decision to exclude another expert witness for the defense due to late notice. Because this issue is unlikely to recur, we note only that a finding of prejudice requires more than speculation about whether, if the Commonwealth wished to hire an expert in response to the defendant's expert, it would have time to do so. See generally Commonwealth v. Durning, 406 Mass. 485, 496 (1990). See also Commonwealth v. Dranka, 46 Mass. App. Ct. 38, 42 (1998), quoting Chappee v. Vose, 843 F.2d 25, 31 (1st Cir. 1988) ("the preclusive sanction should be reserved for 'hard core transgressions'").

481 Mass. 443, 447 (2019). To ensure this impartiality, a judge must hold individual voir dire if "it appears that a [prospective] juror might not stand indifferent" in the case. Id. See G. L. c. 234A, § 67A (detailing individual voir dire requirement).

Although the judge enjoys broad discretion in determining both the scope of this inquiry and whether a prospective juror stands indifferent, see Commonwealth v. Perez, 460 Mass. 683, 688 (2011), citing Commonwealth v. Vann Long, 419 Mass. 798, 803 (1995), "this discretion is not unfettered." Williams, 481 Mass. at 447. Specifically, a "judge's conclusion must be supported by a voir dire that sufficiently uncovers whether the prospective juror can fairly evaluate the evidence and follow the law." Id. Cf. Seabrooks, 433 Mass. at 443 (when "a judge has explored the grounds for any possible claim that a juror cannot be impartial, and has determined that a juror stands indifferent, we will not conclude that the judge abused his discretion by empanelling the juror unless juror prejudice is manifest"). Such support for the judge's conclusions was lacking here in regard to several jurors.

During attorney-conducted voir dire, defense counsel asked the prospective jurors: "Does anyone here currently presume [the defendant is] innocent?" Seven prospective jurors indicated that they did not presume the defendant to be

innocent.  On this basis, the defense counsel challenged those
seven jurors for cause.  The judge inquired whether three of
these prospective jurors would be able to presume the defendant
to be innocent.[30]  The judge did not, however, conduct individual
voir dire with the other four because, he stated, defense
counsel had failed to raise any specific concerns about them.[31]
Regarding one of the four, the judge noted that this juror had
been a prosecutor and believed that for this reason, the juror
understood the presumption of innocence.

Once it had become apparent that some jurors might have
difficulty presuming the defendant to be innocent based on the
jurors' answer to a question directly focusing on this issue,
the judge had a duty to inquire further.[32]  See Williams, 481
Mass. at 447.  "Although the judge may reasonably determine,
after a meaningful inquiry, that a juror's doubts about his or
her own impartiality are unfounded, that determination should be

---

[30] After conducting individual voir dire, the judge
dismissed two of the jurors for cause while finding that there
was no basis to challenge the third for cause.

[31] At this point, defense counsel reemphasized the basis of
her challenge, noting:  "What I would say for specifics are that
they didn't have their hands up for 'Who thinks he's innocent
right now?'"

[32] Because the jurors in question affirmatively indicated
that they might have difficulties presuming the defendant to be
innocent, the Commonwealth's invocation that jurors are presumed
to follow a judge's instructions is unavailing.  See
Commonwealth v. Montez, 450 Mass. 736, 746 (2008).

made after the judge conducts an inquiry that could be reasonably expected to determine impartiality." Commonwealth v. Auguste, 414 Mass. 51, 57-58 (1992). The attorney voir dire question was a reasonable one, and one that clearly required further inquiry. Whatever else a meaningful inquiry may include, it must include an actual inquiry. See id. at 57. The judge's failure to conduct individual voir dire of four jurors who indicated that they did not assume the defendant was innocent was error.

Although we reverse on other grounds, we note why this error did not prejudice the defendant in order to provide further clarity to this area of law. When a defendant is forced to use peremptory challenges because a judge fails to conduct an adequate individual voir dire, this does not necessarily constitute reversible error. See, e.g., Commonwealth v. Bryant, 447 Mass. 494, 499-500 (2006) (defendant could have challenged peremptorily juror that judge declined to strike for cause); Commonwealth v. Nelson, 91 Mass. App. Ct. 645, 647-648 (2017) (same). Instead, "prejudice generally is shown by the use of a peremptory challenge to remove the juror who allegedly should have been excused for cause together with evidence that the defendant later was forced to accept a juror he would have challenged peremptorily but was unable to because his peremptory

challenges had been exhausted" (emphasis in original).
Commonwealth v. McCoy, 456 Mass. 838, 842 (2010).

In sum, if a defendant both still has remaining peremptory challenges sufficient to cover the number of jurors that a judge should have inquired into for cause, and is unable to show that there were other deliberating jurors whom the defendant would have challenged peremptorily but for the error, then there is no prejudice. Compare Commonwealth v. Susi, 394 Mass. 784, 789 (1985) (reversal required where judge's erroneous refusal to dismiss juror for cause led to defendant exhausting peremptory challenges and being forced to accept juror he otherwise would have challenged), with Commonwealth v. Amazeen, 375 Mass. 73, 83-84 (1978) (reversal not required where defendant had not exhausted peremptory challenges).

Ultimately, defense counsel here exercised five of her six peremptory challenges, using three against prospective jurors with whom the judge had declined to conduct individual voir dire. This left counsel with one final peremptory challenge. Yet despite having the right to use it, counsel did not use the peremptory for the fourth juror with whom the judge had declined to conduct individual voir dire. Consequently, there is no prejudicial error.

ii. Final peremptory challenge. After defense counsel exercised her peremptory challenges against the jurors that the

judge failed to strike for cause, the Commonwealth unsuccessfully raised a challenge based on Commonwealth v. Soares, 377 Mass. 461, cert. denied, 444 U.S. 881 (1979). At this point, the judge informed the parties that they had reached the number needed to seat a jury. The clerk dismissed the challenged jurors and subsequently began to announce the juror numbers that would comprise the jury. Defense counsel then informed the judge that she had miscounted the number of seated jurors and had thought there would be more juror selection. Because another panel was unnecessary, defense counsel wanted to exercise the defendant's final peremptory against one of the seated jurors. The judge declined.

At issue on appeal is whether the judge abused his discretion by ruling that the time to exercise peremptory challenges had passed. Neither peremptory challenges nor, more importantly, the timing of when they should be used are mandated by either the United States Constitution or the Massachusetts Declaration of Rights. See Commonwealth v. Seng, 456 Mass. 490, 496 (2010), citing Commonwealth v. Freiberg, 405 Mass. 282, 292, cert. denied, 493 U.S. 940 (1989). Instead, Mass. R. Crim. P. 20 (c) (2), 378 Mass. 889 (1979), establishes parameters for when peremptory challenges may be used: parties may exercise their peremptory challenges after a juror is found indifferent, but must exercise them before the jurors are sworn. Within this

window, judges have discretion to further designate when parties may exercise their peremptory challenges.  See Rule 6(4)(i)(i) of the Rules of the Superior Court.[33]

The defendant contends that the judge here failed to articulate any additional timing requirements.  The judge's instructions -- which we set out in the margin -- say otherwise.[34]  The judge first explained how jury empanelment would work at the outset of the process.  Then, after attorney-

---

[33] Rule 6(4)(i)(i) of the Rules of the Superior Court provides:

"After the trial judge finds that each juror stands indifferent, the parties shall exercise their peremptory challenges.  The trial judge may require exercise of peremptory challenges after completion of side bar inquiry of an individual juror, after filling the jury box with jurors found to stand indifferent, or at some other time after the trial judge's finding of indifference."

[34] "[W]e'll seat the twenty-four or so people, the three rows of eight that we have.  You'll both have, of course, because of the -- this case being what it is, six preemptory [sic] challenges.  You'll both have [fifteen] minutes for the panel questions.  Usually, we start with the Commonwealth and then go to the [d]efendant.  After we go through the phases, then, -- that is, the group questioning, the individual questioning, and the attorney-conducted voir dire -- then I'll ask you if there are any cause requests.  And then I'll ask you to use your preemptory [sic] challenges.  And hopefully we'll get a jury impaneled with one panel.

"If we have to go to a second panel, however, I'll discuss with you the size of that second panel, depending on our needs, how many jurors we actually need, to fill out the jury.  And then we'll adjust accordingly, depending on the number of preemptories [sic] left and things like that."

conducted voir dire had finished, the judge reminded the parties of where they were in the process, stating that "starting with the Commonwealth, I'll hear you on your challenges, either for cause, first, if any, and then preemptory [sic]; and then turn to the [d]efendant."

Perhaps the judge could have expressed more emphatically his intent throughout.[35]  Nevertheless, the instructions are reasonably clear when taken together:  the parties had to exercise their peremptory challenges then or never.  Moreover, the defendant sought to exercise the peremptory challenge after the judge informed counsel that they had reached the number needed to seat a jury, and after the remaining prospective jurors were excused.  Having set the parameters, it was within the judge's discretion to deny defense counsel's request to exercise her final peremptory challenge once the time do so had passed.[36]  Thus, there was no error.

---

[35] For example, a better way to express the point would have been to say after informing the parties of when they would be able use their peremptory challenges the following sentence: "This will be the only time to use your peremptory challenges during the first panel."

[36] The defendant also argues that the judge's reference to a second panel made it appear that there would be two opportunities to use peremptory challenges.  That it did -- but only if a second panel was necessary.  As it turned out, one panel was sufficient.

b.  Hearsay.  At trial, the defendant testified that upon seeing Cherniak slash his tires, the defendant confronted Cherniak and Arthur-Smith.  According to the defendant, Arthur-Smith responded by disputing the account and then said, "Even if you did, how the fuck can you prove that?"  The judge excluded the testimony on the ground of hearsay.  Because the defendant objected, we review for prejudicial error.[37]  See Commonwealth v. Santos, 460 Mass. 128, 137 (2011).

"The rule against hearsay bars admission of out-of-court statements offered for their truth."  Commonwealth v. Mendes, 463 Mass. 353, 367-368 (2012).  See Mass. G. Evid. § 801(c) (2021).  Statements offered to show the effect on the listener, however, are not offered for their truth and therefore are not hearsay.  See, e.g., Commonwealth v. Spinucci, 472 Mass. 872,

---

[37] Additionally, the defendant claims that the judge erred in preventing him from testifying that Cherniak had tried to get the defendant to use cocaine.  Specifically, the defendant appears to claim that the judge improperly excluded the testimony as hearsay, despite Cherniak's offers of cocaine allegedly striking fear in the defendant.  The judge did not exclude the testimony because it was hearsay but on other grounds.  (The judge did eventually allow the defendant to testify that Cherniak had asked him to sell drugs on numerous occasions.)  Because the defendant does not address the grounds on which the judge excluded the testimony, we do not address the issue.  Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019) ("The appellate court need not pass upon questions or issues not argued in the brief").  The evidence may well be admissible at retrial if it is relevant to demonstrate the defendant's fear of the victim or some other relevant nonhearsay purpose that is not substantially outweighed by the danger of undue prejudice.

883 (2015); Commonwealth v. Daley, 439 Mass. 558, 569 n.8 (2003). See also Mass. G. Evid. § 801(c) note.

Here, the defendant offered Arthur-Smith's statement to show the effect it had on him: namely, how the statement confirmed the defendant's belief that Cherniak had slashed his tires. In particular, the statement went to the defendant's fear of Cherniak and whether the defendant's resulting actions were reasonable. Therefore, the statement was not hearsay, and it was relevant for a nonhearsay purpose. The judge erred in barring its admission.

Conclusion. The judgments against the defendant are reversed, the verdicts are set aside, and the case is remanded to the Superior Court for a new trial and further proceedings consistent with this opinion.

So ordered.